(*) BRYANT *versus* CROSBY, *Executor.*

A contract signed by a party upon receiving the possession of personal property, and containing his promise to pay for the same, and also an agreement that the property shall remain the property of the other party till the payment should be made, is not a *bailment* but a *conditional sale*.

If such a contract, though not signed by the vendor, describe the property as "in good order and condition," such description is equivalent to a representation, and, if he knew it to be untrue, will vacate the contract.

Bryant *v.* Crosby.

But, though untrue, it will not have that effect, unless, at the time of making it, it was known to be untrue.

A surety cannot be discharged on the ground of fraudulent representations made to his principal, except when that principal would be.

That concealment by a vendor in the sale of goods, which would entirely discharge the surety of the vendee, is a concealment of facts, known to the vendor and not known to the vendee or his surety, being facts of a character to increase materially the risk beyond that assumed in the usual course of business of that kind, the vendor having a suitable opportunity to make them known.

After chattels have been delivered by the principal in part payment of his note, it is competent for him to adjust their value with the payee, and his written admission upon the contract of the amount remaining due, will be binding upon his surety, unless there be proof of error or fraud in making it.

Parol testimony cannot be received to give the effect of a mortgage to a bill of sale, absolute in its form, though not under seal.

Though a bill of sale may purport to be for a cash consideration already paid, it is competent to prove by parol that the payment was not made in cash, and also to show in what mode it was made.

ON EXCEPTIONS from *Nisi Prius*, APPLETON, J., presiding.

ASSUMPSIT, on a contract signed by Oliver Crosby, the defendant's testator, as surety; viz.: —

" Received of Nathaniel Bryant four hundred and seventy-five sheep and twenty-five rams, now in good order and condition, for which we jointly and severally promise to deliver to him at E. T. Morrill's house, in Atkinson, thirty-five hundred pounds of wool, one half of it to be delivered in June, 1848, and the other half in June, 1849. The wool to be equal in quality to that grown on said sheep, and well washed on the sheep, and done up in good order and condition; and the said stock and the wool sheared from them, and all increase shall be and remain at all times the property of said Bryant until the payments are made as above, and the same shall be well kept at our risk, and on failure to make any payment as aforesaid, or if they pass out of our hands, said Bryant may take them at any time and we will pay all expense and damage. " E. T. Morrill, *Principal.*

" Oliver Crosby, *Surety.*

" Atkinson, Nov. 30, 1847."

On the back of the contract were the following indorsements : —

" 1186¼. — December 29, 1848.   Received eleven hundred and eighty-six and one-quarter pounds of wool in part on the within.

" October, 1849.   Received three hundred and twenty-one pounds of wool on the within in part.

" July 16, 1850.   Received one hundred and seventy-two and a half pounds.

" August 26, 1850.   The amount due on this obligation this day is six hundred and sixty-three dollars and twenty cents.
" $663,20.                              " E.  T.  Morrill."

The plaintiff read the contract and there stopped.

Upon notice to produce, the defendant introduced a bill of sale made by Morrill, as follows : —

"Aug. 26th, 1850.

"In consideration of six hundred and sixty-three dollars, and twenty one-hundredths, paid by Nathaniel Bryant of Dexter, I this day sold, transferred and delivered to said Bryant the following personal property on my farm in Atkinson, viz. :

| | |
|---|---:|
| 20 tons hay, the same in my barn, | $100 00 |
| 1 stud horse, | 100 00 |
| 600 bushels of oats, being all standing and growing on said farm as estimated, and those already harvested, and I am to harvest those not harvested and put the same into the granary in my barn in good condition, to be at said Bryant's disposal at any time he calls for the same, at 25 cents per bushel, | 150 00 |
| 2 oxen, about ten years old, of light red color, at | 40 00 |
| 2 cows, one nine and the other twelve years old, both red, at | 25 00 |
| 1 bull, 3 years old, at | 20 00 |
| 11 rams, marked with red paint, | 13 20 |
| 1 gray mare, 3 years old, and one racking colt, | 85 00 |
| 50 bushels wheat, as estimated, which I am to harvest and deliver when called for in good condition, | 50 00 |

Bryant *v.* Crosby.

| | | |
|---|---|---|
| 1 old mare, dark red color, 20 years old, at | 25 | 00 |
| 1 yearling colt, red color, | 25 | 00 |
| 50 bushels corn, which I agree to harvest in good condition and deliver the same as soon as the same can be threshed out, in merchantable order, | 30 | 00 |
| | $663 | 20 |

" Said property all having been left in my charge, I hereby agree to keep the same safely in good condition, all at my risk, and in case of loss or any deficiency in the oats, or wheat, or corn, or loss in any shape, I agree to pay the same to said Bryant, he having the right to take any part or the whole of the same any time he may wish so to do.

"E. T. Morrill."

On the back of this paper were the following indorsements :

" Sept. 27, 1850.   Received on the within

| | | |
|---|---|---|
| one stud horse, valued at | $100 | 00 |
| 1 old mare, twenty years old, valued at | 25 | 00 |
| 11 rams, | 13 | 75 |
| Also, one gray mare, three years old, and colt by her side, | 85 | 00 |
| 1 one year old colt, | 25 | 00 |
| | $248 | 75 |

| | | |
|---|---|---|
| October 4, 1850.   Received one pair of oxen ten years old, | 40 | 00 |
| 2 cows, | 25 | 00 |
| 1 bull, | 20 | 00 |
| | $85 | 00 |

| | | |
|---|---|---|
| Dec. 21, 1850.  Received on the within 50 bushels corn, | 30 | 00 |
| 23½ bushels wheat and rye, | 25 | 50 |
| 1 pair of oxen, yoke and chain, | 70 | 00 |
| 1 wagon, | 55 | 00 |
| 1 cow, | 15 | 00 |
| 36 bushels corn, at 75 cents, | 27 | 00 |
| For keeping oxen and men, | 6 | 50 |
| | $227 | 00 |
| | $554 | 25" |

The plaintiff thereupon introduced Jethro Goodwin and the said E. T. Morrill, who both testified, against the defendant's objection, that said paper was taken as collateral security, and not as an absolute sale. It was not recorded by the town clerk of Atkinson or any where.

Morrill further testified, that the first conversation he had about the trade for the sheep, was in October, 1850, at Bryant's house in Dexter, and again a few days afterwards at the same place, where he agreed upon the trade. That afterwards Bryant came to his, (Morrill's) house in Atkinson, a few days before the date of the contract in suit; that Bryant brought the contract ready prepared for signature, except as to date; that he (Morrill) wrote the date; that he did not know that Bryant and Oliver Crosby had any conversation about it; that after Bryant went away, he (Morrill) presented the contract to said Oliver Crosby and requested him to sign it; that said Oliver did sign it. Morrill wrote the date and one other word in the contrat, viz.: the word "our." That the contract being signed he took it and went with it to Dexter about the 6th of December, 1847, to get the sheep; that he selected 400 sheep from one flock, and examined them; that then he, with Bryant, went one or two miles to another place, where was another flock of three or four hundred; that a large number were in a barn; that they were driven from the barn out of the door and counted as they went out; that he did not see much difference in them; thinks he did not take them all as they came out; thinks he rejected some; got as good as he could get; that he delivered to Bryant the contract in suit at the same time; that the sheep were driven to his place in Atkinson in two days, 18 miles; part of the time it was rainy and snow fell. Got them home and they were mingled with the flock of sheep which he had previously drove, consisting of about 40 sheep; thinks none died within three weeks; then many of them showed signs of disease; were relaxed; thought they had the rot; thinks he did not lose more than 25 till after the 1st of February; that during that winter from 250 to 300 of them died of this disease; the next winter about 150

sheep more died; that some of those previously owned by him died in the same manner.

Ebenezer Brown, called by plaintiff, testified that he was present at the time of the selection of all the sheep by Morrill; that the last 100 were selected from a flock of 350; the sheep were put into a barn, and turned out at the door as they run till 100 were counted; Morrill said he was in a hurry, and he would take them in that way; that he was satisfied with the sheep.

There was other testimony tending to show that a large number of the sheep at the time they were driven to Atkinson were old, poor and diseased; and there was evidence tending to show that they were well kept, and the contrary; that the sheep began to die the next day after they were driven to Morrill's farm, and so from day to day afterwards.

There was evidence tending to show, from other witnesses, that they bought sheep of Bryant from the same flock from which Bryant got his sheep the same fall; that many of them proved to be diseased, and about half of them died the ensuing winter, and that other sheep which were mingled with the sheep which they bought of Bryant became infected and died.

There was no evidence that Oliver Crosby ever saw the sheep till they were driven to Morrill's farm in Atkinson. There was evidence tending to show that the market price of wool, such as specified in the wool contract, was low during the months of June, 1848 and 1849; that the market price was higher on the 29th of December, 1848 and in October, 1849, and July 16th, 1850; that it was worth more at those times than during June, 1848, and June, 1849, and so of wool generally.

There was evidence tending to show, that in relation to the oats and hay mentioned in the paper of the 26th of Aug., 1850, there was a deficiency, the amounts therein specified not having been raised by Morrill on the place that year and he not having the same.

The defendant contended on the question of fraud, to the

jury, that if Bryant prepared and delivered the contract in the manner testified by Morrill, and if Oliver Crosby so signed it, and did not see the sheep himself, and if Morrill took it and got the sheep, and delivered the contract to Bryant in the manner testified by Morrill, and if the sheep were in fact different from those described in the contract, or if they were not in good order and condition, the surety was discharged. The Court instructed the jury, that if Bryant made any representations to Morrill that were untrue, although Morrill saw the sheep and selected them, it would discharge the surety.

The defendant contended, that if Bryant delivered sheep to Morrill, under the circumstances testified to by Morrill, which were not in good order and condition, the defendant would be discharged. The Court instructed the jury, that if Bryant delivered sheep to Morrill, knowing they were diseased, and concealed the fact from Morrill, Oliver Crosby would be discharged.

The defendant requested the Court to instruct the jury, that the preparation of the contract by Bryant, and the obtaining the signature of the surety under the circumstances, testified to by Morrill, and the delivery of the sheep implied a warranty to the surety that the sheep were in good order and condition, and that if they were in fact not in good order and condition, the defendant should have the benefit of it on the question of damages. The Court declined to give the instruction, but did instruct the jury that if there was a warranty, they might consider what damages he, Morrill, has sustained by any breach of such warranty, and make a deduction correspondent thereto.

The Court instructed the jury to inquire whether on all the evidence the paper of August 26th, 1850, was an absolute sale, or whether it was taken as collateral security; that if it was taken as collateral security, and if Morrill had liberty from Bryant to sell any of the property; and did so sell, whether the proceeds were paid to Bryant or not, the loss was on Bryant, and the surety was discharged to that extent; but that if Morrill sold any of the property without consent or

Bryant *v.* Crosby.

authority of Bryant, then Bryant would not be responsible for such sale.

The Court also instructed the jury that, in relation to the computation of the amount due on the contract sued, they should consider the fair price of such wool as described in the contract in June, 1848, and consider the indorsement of December 29th, 1848, as a payment made in June, 1848, without regard to the difference in value from June to December 29th, and add interest to the balance. That in relation to the second installment they should consider the fair price of the wool in June, 1849, and consider the indorsement of October, 1849, as made in June, 1849; and also the indorsement of July 16, 1850, as made in June, 1849, and add interest to the balance, without regard to the difference in the value of such wool from June, 1849, to the several indorsements.

The Court also instructed the jury that if the paper of Aug. 26th was taken as collateral security, they should inquire how much, upon the principles stated, the plaintiff had received on the contract sued and on the paper of 26th August, (casting interest to the several times of payment as indorsed on said paper of 26th August, deducting the indorsements and casting interest on the balance to the next indorsement, and so to the time of the rendition of their verdict,) and render a verdict for the balance, if any; and further, that if the paper of 26th August, was found to be an absolute sale, they should inquire whether there was in fact any deficiency in the hay and oats, and other property, and if they did so find, they should render a verdict for the amount of such deficiency with interest. Further, that though they should find the paper of 26th August to have been taken as collateral security, yet that they might answer how much that deficiency amounted to, and the interest on the same, on the supposition that it was an absolute sale.

The jury, after being out some time, returned into Court and asked the Court to instruct them whether, if they found that there was a deficiency, and that other property was indorsed on the paper of August 26th, not originally included in it they had a right to substitute that property for the deficiency

The Court instructed the jury that, on the hypothesis that the bill of sale was absolute then the plaintiff would be chargeable for so much as was in existence, and was by the bill of sale conveyed to the plaintiff, and that if one article of property was substituted for another it was a matter between plaintiff and Morrill, unless on the whole the plaintiff had been paid; that they would see how much there was conveyed in and by the bill, and if all the property, to the amount therein specified, passed to him, then the debt was paid; if there was a deficiency they would see how much in fact passed, either in the original bill of sale or by substitution, for articles therein, which, with any other payments, should be allowed the defendant, and they would see what, if any, balance, was due.

The jury returned to their room and rendered a general verdict for the plaintiff for the sum of $108,81, and also, —

"The jury decide that if the memorandum, dated August 26, 1850, is a bill of sale, that the actual property falls short of the amount specified in the bill fifty-five dollars, and that the interest on the same amounts to eight dollars and seventy-four cents, making a difference of sixty-three dollars and seventy-four cents."

To the above rulings and instructions the defendant's counsel excepted.

*J. Crosby*, for the defendant.

*S. H. Blake*, for the plaintiff.

SHEPLEY, C. J. — It is insisted in defence, that the contract made on Nov. 30, 1847, constituted a bailment and not a sale of the property.

No option was given to Morrill upon any contingency to return it; and none to the plaintiff to reclaim it, except upon the failure of Morrill to make the payment or to retain possession. The contract therefore provided not for a bailment but for a conditional sale.

It is also insisted, that it contained a warranty by the plain-

Bryant *v.* Crosby.

tiff, that the sheep were at the time of sale "in good order and condition."

It was not signed by the plaintiff. The engagements were not made by him, but to him. He entered into no warranty. The idea is presented by those words to both parties, that the sheep were in that condition ; and that is equivalent to a representation, that they were. It being regarded as a representation made by him, the plaintiff would be guilty of fraud, if he then knew that they were not in that condition.

The jury were instructed, "that they would look at all the evidence and see if Bryant made any representations to Morrill, that were untrue, and if he did, although Morrill saw the sheep and selected them, it would discharge the surety."

A surety cannot be discharged on the ground of fraudulent representations made to his principal, except when that principal would be. The plaintiff could not in law be considered as conducting fraudulently, unless he knew that the representations were false. To make him lose his security, because his representations were untrue, when he did not know them to be so, is to impose upon him the risk of a warrantor.

A fraudulent concealment of facts from his principal, would not necessarily have the effect to discharge the surety; while he would be relieved so far as his principal would be.

A concealment, which entirely discharges a surety, is one of facts known to the other party and not known to him, and known to be of a character to materially increase the risk beyond that assumed in the usual course of business of that kind, having a suitable opportunity to make them known to the surety.

Respecting these matters the instructions were too favorable to the defendant.

Three indorsements had been made upon the contract, of wool received in part payment after the time, when the payments should have been made. The price of wool might have been quite different at the times when it was delivered, and when it was by the contract to be delivered. After the

actual delivery and indorsement of it the principal parties agreed upon the amount remaining due upon the contract, and that was indorsed upon the back of it and subscribed by Morrill. They had a right to adjust the matter respecting the price to be allowed for the wool, according to their own pleasure, although the effect of those indorsements might be different from what they would otherwise have been. When they had thus made an adjustment, neither party could be relieved from it without proof of some error, mistake or fraud in making it. There being no such proof, the jury were instructed to find what would be due on the contract, according to a mode of reckoning stated, without regard to that settlement made by the parties. The mode prescribed was less favorable to the defendant than the adjustment. In this there was error, and for this cause a new trial must be granted.

As the same questions may be again presented, arising out of the sale of property from Morrill to the plaintiff on August 26, 1850, and the indorsements upon that contract, a new trial may be prevented or facilitated by an opinion upon its effect.

It is in form an absolute sale of the property described. Parol testimony cannot be received to vary it and give to it the effect of a mortgage. There is nothing found in it stating or indicating, that the property or the price of it was received in part payment of the contract made on November 30, 1847. It states, that the consideration had been already paid by the plaintiff to Morrill, leaving the inference, that it was a transaction having no connexion with the sale or payment for the sheep.

It is only by the reception of parol testimony, that proof can be made that the consideration had not been in fact paid, as it purports to have been. The contract is not under seal and there can be no legal objection to the admission of such testimony. It is only by the like testimony, that the defendant can prove that the property, or the agreed price of it, was to be applied in payment of the first contract; and if such testimony be admitted, it follows, that it must be to prove to what

extent property has been received and not paid for, and to be so applied.    Such testimony may be received, for it will not vary the terms of the written contract.    A surety, by such testimony, cannot claim to have more so applied than his principal could.    If the first contract were otherwise paid, Morrill could not recover by virtue of the last payment for hay, wheat, or oats, without proof of their delivery to the plaintiff; for by the contract they were in the charge and at the risk of Morrill.    Parol testimony might also be received, to prove that the property, or the price of it, received on Dec. 21, 1850, was to be applied in payment of the first contract.

*Exceptions sustained, verdict set aside,*
*and new trial granted.*

TENNEY, RICE and HATHAWAY, J. J., concurred.