## GOODWIN v. ABILENE STATE BANK.
(No. 42.)

Court of Civil Appeals of Texas. Eastland.
April 8, 1927.

Appellee's Motion for Rehearing May 20, 1927.

**1. Appeal and error ⟸⟹989—Sufficiency to raise question for jury, not weight of evidence, is question in determining whether directed verdict was proper.**

In determining whether directed verdict was proper, preponderance of evidence is not involved, but sufficiency of material evidence, viewed in light most favorable to the complaining party, to raise a question for the jury.

**2. Principal and surety ⟸⟹42—Creditor must make full disclosure of material facts known to him and unknown to inquiring surety.**

Prospective creditor must make full disclosure of material facts known to him and unknown to surety, where prospective surety inquires of him concerning subject-matter of suretyship.

**3. Principal and surety ⟸⟹42—Prospective surety's inquiry of bank president created trust relationship requiring bank to inform him of material facts of risk.**

Prospective surety's inquiry of bank president for information about business, to invest in which principal desired credit, created trust relationship requiring the bank to inform him of every material fact, including customer's existing indebtedness.

**4. Principal and surety ⟸⟹162(2)—Bank's fraud in procuring surety's signature, given to enable principal to become partner in customer's business, held for jury.**

Question of bank's fraud in procuring surety's signature, given to enable principal to become partner in bank customer's business, *held* for jury, under evidence that bank president told surety on preliminary inquiry it was good business, that he failed to disclose customer's insolvency, and soon after crediting $7,000 note to new partnership charged to account $5,999.64 on customer's bill of exchange.

**5. Principal and surety ⟸⟹95—Surety is discharged where bank, after obtaining signature, secretly diverts to pre-existing debt credit intended by surety as principal's working capital.**

Surety is discharged where bank, in 15-minute interval after receiving his signature on $7,000 note to enable principal to become partner in insolvent bank customer's business, formulates and executes intention to charge new partnership with customer's pre-existing debt of $5,999.64 without disclosure to surety, and knowing he expected money to be used as working capital.

**6. Banks and banking ⟸⟹228—Surety, defending renewal note for antecedent bank's fraud, sustained burden of proving identity of institutions sufficiently to take case to jury.**

Surety, defending renewal note on ground of fraud of antecedent bank in original note's inception, sustained burden of proof as to identity of two institutions sufficiently to submit issue of fraud to jury, where only substantial evidence that two corporations differed was fact of separate charter.

**7. Banks and banking ⟸⟹65—Whether bank, reorganized under separate charter, is distinct entity from former, is largely question of intention.**

Whether a bank, which is but a reorganization of another, procuring a separate charter to enable it to continue the former's business, is a separate entity, is largely a matter of intention.

**8. Corporations ⟸⟹1—Courts' tendency is to disregard corporate fiction when invoked to protect fraud.**

The modern tendency of courts is to disregard the corporate fiction, when it is invoked as a means of protection against fraud.

**9. Pleading ⟸⟹398—Variance between pleading and proof, to be fatal, must be misleading and surprise.**

Variance between pleading and proof must, to be fatal, be material, of such character as to mislead or surprise the adverse party.

**10. Banks and banking ⬤⟿228—Variance that defense related to predecessor bank would not take case from jury, where plaintiff met issues without objection.**

Proof of fraud in inception of original note given to bank's predecessor would not be withheld from jury for variance, notwithstanding plaintiff bank had separate charter, where bank was not misled or surprised, but appeared, met issues by evidence, and made no objection to admissibility of testimony on that ground, and plaintiff's president referred in testimony to the two institutions as the same.

**11. Principal and surety ⬤⟿162(2)—Notice to surety and his diligence in discovering bank's diversion of credit from intended purpose held for jury, where note was renewed.**

Questions of notice to, and diligence of, surety in learning that creditor had applied proceeds contrary to surety's known intention, arising on evidence of surety's relationship to principal, repeated renewals of note, and surety's application for additional credit, *held* for jury.

**12. Notice ⬤⟿15—Actual notice is question of fact for jury.**

The question of actual notice is one of fact for the jury, to be determined on the weight of evidence under all the circumstances of the case.

Pannill, C. J., dissenting.

Appeal from District Court, Taylor County; W. R. Ely, Judge.

Action by the Abilene State Bank against W. C. Goodwin and another. Judgment for plaintiff, and defendant named appeals. Reversed and remanded.

See, also, 287 S. W. 1111.

Stinson, Coombes & Brooks, of Abilene, for appellant.

Wagstaff, Harwell & Wagstaff, of Abilene, for appellee.

HICKMAN, J. The views entertained by the majority of this court, as now constituted, on the different questions presented by this appeal, are such as to require that we write upon it as upon an original hearing. Suit was upon a promissory note executed by D. E. Cozart and W. C. Goodwin to the Abilene State Bank for the principal sum of $7,000. The note declared upon was the eighth renewal of an original note executed to the Guaranty State Bank. Goodwin alone has appealed from the judgment of the trial court. As a defense to the note, appellant, Goodwin, pleaded his suretyship and fraud on the part of the bank in procuring his signature as surety to the note. The pleading will not be set out here, because we shall find it necessary to detail a summary of the testimony offered by him, and there is no question raised as to the sufficiency of the pleading to support the proof. Upon the conclusion of the testimony, the court instructed the jury peremptorily to return a verdict against the defendants, and upon this verdict a judgment was entered against the appellant and Cozart, jointly and severally, for the amount of the note, including interest, attorney's fees and costs of suit. The question presented for our decision is whether or not the facts proved raised questions of fact which should have been submitted to the jury for determination. We are not called upon to determine any other question.

[1] In determining whether the issues of fact raised by the testimony should have been submitted to the jury, we shall consider only the evidence favorable to appellant's contention.

As stated in the case of Stewart v. Miller (Tex. Civ. App.) 271 S. W. 311, no question of preponderance of evidence is involved. If the evidence of the appellant bearing upon the issues, taken in its most favorable light, was sufficient to raise a question of fact for the determination of the jury, then it was error for the court to withdraw the case from the jury and determine the facts himself. Progressive Lumber Co. v. Ry. Co., 106 Tex. 12, 155 S. W. 175; Charles v. El Paso Electric Ry. Co. (Tex. Com. App.) 254 S. W. 1094.

Applying this rule to the issues in this case, it becomes necessary for us to examine the statement of facts, and determine what pertinent testimony is disclosed therein favorable to the contention of appellant.

F. V. Matthews was engaged in the business of buying and selling at wholesale and retail, flour, meal, molasses, and other products in the city of Abilene, Tex. D. E. Cozart entered into negotiations with him with reference to becoming a partner with him in the business. Appellant, Goodwin, is the father-in-law of Cozart. Cozart had not sufficient credit rating with the bank upon which to procure capital for the operation of the business, and spoke to his father-in-law, appellant, with reference to his becoming surety for him at the bank, in order to borrow the necessary money for operating capital. Cozart also talked at different times with A. E. Poole, president of the then Guaranty State Bank, and was informed by Poole that Goodwin would be acceptable to the bank as a surety for a loan. While Goodwin was in the bank after his son-in-law had talked to him regarding this matter, Poole approached him and stated to him, in substance, that Cozart had told him he was thinking of going in business with Matthews. Goodwin replied that he had been informed of the same facts, and inquired of Poole what he thought about Matthews' business. Poole told Goodwin that he thought it was one of the best businesses in Abilene,

and he would like to have it himself; that Goodwin could not go wrong by helping his son-in-law in this business. Goodwin informed Poole that he was a "straight cowpuncher" and had been all of his life; that he knew nothing about books and figures, but wanted to help Cozart, if it was a good business that he was buying into. Poole told him that he himself had formerly been in that kind of business, that it was a good business, and that Matthews' business, if properly run, would be a paying business. Goodwin hesitated about signing the note, and had two or three different conversations with Poole about the matter before he finally agreed to sign. At and prior to the time of the execution of the note by Goodwin, the matter of the use to which the proceeds of the note were to be applied was discussed between Poole and Goodwin, and it was Goodwin's understanding that all of the proceeds were to constitute an operating capital from that day in the business of Matthews & Cozart. Prior to that time, according to Poole's testimony, he had told Cozart that $7,000 would not run the business, but that it would take more money if he did the business that Matthews had been doing, because Matthews had used as high as $16,000 or $17,000. Cozart's reply to Poole was that he did not want to "hit Mr. Goodwin up too hard," but that "we will take care of that as it comes." When the amount of the loan was discussed between Poole and Goodwin, Poole at first told Goodwin that $6,000 would be sufficient, but later suggested that perhaps the amount had better be made $7,000. Poole did not tell Goodwin that he thought more than $7,000 would be required to operate his business.

The original note was executed for the principal sum of $7,000. At the time Goodwin executed the note, Matthews was insolvent, and was indebted to the Guaranty State Bank on a bill of exchange account in the amount of $5,999.64. When Goodwin executed the note, the account of Matthews & Cozart was credited with $7,000, and, within 15 minutes after Goodwin left the bank, Poole charged this account with $5,999.64 to cover the pre-existing debt of Matthews to the bank. Goodwin never knew that this sum had been applied to the payment of Matthews' debt until after he executed the last renewal note sued upon, and, as soon as he learned thereof, he went at once to the bank and demanded of Poole that he replace the amount of this debit to the funds for which it was borrowed. This Poole refused to do, and this suit followed.

Appellee seeks to sustain its judgment and justify the action of the trial court in peremptorily instructing the jury to find in its favor, upon three main grounds, as follows:

First. That, since the evidence shows that the money for which the note was executed was placed to the credit of Matthews & Cozart, the persons for whom it was borrowed, if any conversion of this fund was made by the bank after it was placed to the credit of said firm, then the cause of action, if any, for such conversion, was in the firm, but such conversion would not have the effect of tainting the original note.

Second. The evidence disclosing that the original note was given to the Guaranty State Bank of Abilene, and that the note sued upon was executed to the Abilene State Bank, and that the Abilene State Bank had nothing to do with the original transaction, but such transaction was with the other bank, the appellee bank would not be liable for such fraud, if any, and proof of fraud on the part of the Guaranty State Bank would not correspond to the pleading alleging fraud on the part of the Abilene State Bank.

Third. That the evidence showing that Cozart was the son-in-law of Goodwin, and that the application of the proceeds of the loan was known to Cozart shortly after it was made, and could have been known to the appellant by the slightest degree of diligence, and, the note having been renewed from time to time for several times, and the appellant having applied for and procured additional credit for Cozart in the meantime, in which application he acknowledged the existence of the indebtedness upon which this suit was based, such facts, circumstances, surroundings and conditions show, as a matter of law, that the appellant was in possession of such facts as that he was required to make inquiry regarding the disposition of this fund, which inquiry, it is claimed, would have led him to discover the real facts prior to the last renewal.

These grounds will be discussed in their order.

[2] In considering whether or not the alleged fraud of the appellee tainted the original note, it is necessary to inquire as to the relationship created between a creditor and a prospective surety, where such prospective surety applies to the creditor for information concerning the risk and concerning the business which is the basis of the credit. The contention of appellee in this regard is that it is no concern of the surety as to the disposition made of the funds loaned on the faith of his credit, and that no fraud could be predicated upon the failure of the creditor to disclose all the facts within his knowledge concerning the matter about which inquiry is made.

Let us examine the authorities and determine whether or not they support this contention. In the case of Gano v. Farmers' Bank, 103 Ky. 508, 45 S. W. 519, 82 Am. St. Rep. 596, the appellant and nine others executed to the bank an obligation for $10,000, that one P. T. Pullen might obtain that sum with which to run a milling business. The bank, on the strength of the obligation,

furnished $5,000 with which to pay off a debt then owing to it by Pullen, and $5,000 which was used in the business. In a suit by the bank against Gano upon the contract of suretyship, it was held that he was discharged by the facts. In discussing the reason for the holding, the opinion quotes with approval the rule as thus stated by Mr. Story in his Equity Jurisprudence.

"The contract of suretyship imports entire good faith and confidence between the parties in regard to the whole transaction. Any concealment of material facts or any express or implied misrepresentation of facts, or any undue advantage taken of the surety by his creditor, either by surprise or by withholding proper information, will undoubtedly permit sufficient grounds to invalidate the contract. Section 324. And further, 'Thus if a party taking a guaranty from a surety conceals from him facts which increase his risk and suffers him to enter into the contract under false impressions as to the real state of facts, such concealment will amount to a fraud, because the party is bound to make the disclosure, and the omission to make it under such circumstances is equivalent to an affirmation that the facts do not exist.' "

In the case of Jungk v. Holbrook, 15 Utah, 198, 49 P. 305, 62 Am. St. Rep. 921, it is held that the fraud upon the sureties consists in the situation in which they were placed by the conduct of the other party, and in discussing this question the following language is used:

"If a material fact connected with the contract of suretyship, and directly affecting the sureties' liability, which might influence the sureties in entering into the contract, is concealed from the sureties, or, if knowing the fact, such information is purposely concealed from the sureties, in the interest of the creditor, such concealment, though no inquiry is made by the sureties, amounts to a fraud upon the sureties, and would discharge them from liability."

In the case of Bryant v. Crosby, 36 Me. 562, 58 Am. Dec. 767, it is held:

"A concealment, which entirely discharges a surety, is one of facts known to the other party and not known to him, and known to be of a character to materially increase the risk beyond that assumed in the usual course of business of that kind, having a suitable opportunity to make them known to the surety."

In Fassnacht v. Emsing Gagen Co., 18 Ind. App. 80, 46 N. E. 45, 47 N. E. 480, 63 Am. St. Rep. 322, suit was brought upon a promissory note executed by a woman as surety for her son. As a defense she pleaded that she was an old German woman, unable to read the English language, and unversed in the ways of business; that she signed the note, not knowing the exact amount, but believing it was for the purchase price of certain goods; that the payee knew this to be her belief, but also knew that the amount included a pre-existing debt.

It was held in that case that the failure of the creditor to inform the surety of the fact that the note included a pre-existing debt of her principal was in law a fraud that would release the surety from the entire contract. The authorities on the question are fully discussed in this able opinion. The conclusion is drawn that, if any material fact connected with the contract of suretyship which might influence the surety in entering into the contract is fraudulently concealed with a view to benefit the creditor, such concealment of facts, from one motive or another, would vitiate the contract of suretyship and relieve the surety.

In the case of Haworth v. Crosby et al., by the Supreme Court of Iowa, 120 Iowa, 612, 94 N. W. 1098, a clear reason for the rule is expressed in this language:

"A person may be willing to become surety for another in the purchase of property representing value equal to or exceeding the obligation thus assumed, and yet very reasonably refuse to become the same man's surety for money with which to pay an antecedent debt. In the one case the surety is to some extent protected from ultimate loss by the fact that his principal becomes the owner of additional property which may be applied to the payment of the obligation, while in the other no such benefit or advantage results, and the surety is to that extent prejudiced."

In 32 Cyc. p. 59, the rule is stated in this language:

"Very little said which ought not to have been said, and very little omitted which ought to have been said, and except for which the relation might not have been entered into, was sufficient to avoid the contract."

The rule is summarized in 21 R. C. L. p. 989, § 381, as follows:

"If a surety, before entering into the contract of suretyship, applies to the creditor for information touching any material matter, he is bound, if he assumes to answer the inquiry at all, to give full information as to every fact within his knowledge, and he can do nothing to deceive or mislead the surety without vitiating the agreement. Whether he is bound before accepting the undertaking of the surety voluntarily to inform him of facts within his knowledge which increase the risk of the undertaking depends on the circumstances of the case. The rule seems to be that, if he knows or has good grounds for believing that the surety is being deceived or misled, or that he was induced to enter into the contract in ignorance of facts materially increasing the risks, of which he has knowledge and he has an opportunity before accepting his undertaking, to inform him of such facts, good faith and fair dealing demand that he should make such disclosures to him; and, if he accepts the contract without doing so, the surety may afterward avoid it, though the failure to disclose such facts was not wilful or intentional."

In Williston on Contracts, vol. 2, § 1249, p. 2272, it is stated, in substance, that, if

the creditor knows or has good grounds for believing that the surety is being deceived or misled, or that he is being induced to enter into the contract in ignorance of facts materially increasing the risks, of which the creditor had knowledge, and he has an opportunity to inform the surety of such facts before the execution of the suretyship, good faith and fair dealing demand that he should make such disclosures to him; and, if the creditor accepts the contract of suretyship without doing so, the surety may afterward avoid it.

In Black on Rescission & Cancellation, vol. 2, p. 873, § 342, this language is used:

"But when the surety inquires of the creditor respecting the principal for information which the creditor may properly give, and the creditor withholds the same without sufficient cause, or misleads the surety, it is the creditor who should suffer the loss occasioned thereby."

[3] That the rules above announced have been recognized by the courts of this state is indicated in the cases of Trammell v. Swan, 25 Tex. 473, and Southwestern Surety Insurance Co. v. Hico Oil Mill (Tex. Civ. App.) 203 S. W. 137. From these authorities and many others cited in them, it seems to us to be the well-established rule that, while there may be no duty resting upon a creditor to give information to a prospective surety about which no inquiry is made and concerning which the surety may be presumed to have as much knowledge as the creditor, yet, where such prospective surety makes inquiry of the creditor concerning the nature of the subject-matter of the suretyship, which might in anywise affect the risk which he is to assume, and such creditor undertakes at all to make reply to the inquiry, he is required to make a full and free disclosure of all material facts known to him and unknown to the surety, which might in any manner affect the risk to be assumed, or influence him in becoming a surety. Applying these principles announced to the testimony of the appellant in this case, considered in the light in which the law requires us to view it, the conclusion seems to us to be inevitable that, when appellant applied to the president of the bank for information as to the business in which Cozart contemplated entering, disclosing to such creditor his own lack of information regarding the business, and requesting information of the creditor, such inquiry itself created a trust relation between Goodwin and the bank, imposing upon the bank the duty to inform Goodwin of each and every material fact which might affect his liability. Certainly it was material to the risk to be assumed that approximately $6,000 of the money loaned on the note was to be applied to a pre-existing debt, whether that debt was the debt of Matthews individually or, as contended by appellee, the joint debt

of Matthews and Cozart. Appellant might have been willing to assume the risk of his son-in-law's integrity and ability to conduct a successful business with proper operating capital, and at the same time be entirely unwilling to procure money with which to discharge a pre-existing debt of such son-in-law or his partner. The probability of Cozart's being able to discharge this obligation in the future was materially lessened by the wiping out in advance of practically all of his operating capital.

[4] Under the facts in this record, the jury should have been permitted under proper instructions to have determined the issue as to whether or not there was fraud in this transaction. In our opinion it became the duty of the president of the bank, upon being approached by appellant for information concerning the business of Matthews, when said president assumed to furnish information to appellant upon that subject, to disclose to appellant the fact of Matthews' indebtedness to the bank; his purpose, if in fact he had at that time formed the purpose, of applying a portion of the loan to this pre-existing indebtedness; and the further fact, if he believed it to be a fact as he had theretofore told Cozart, that a much larger operating capital was required to conduct the business than that represented by the loan. The surety had a right to this information, and, however unintentional might have been the withholding thereof on the part of the creditor, if loss was thereby sustained, it should be borne by the creditor rather than the surety.

[5] Nor would the rule be altered if the purpose to apply a portion of this money to the pre-existing indebtedness was formed during the 15-minute period between the execution of the note and the application of most of its proceeds. The surety is interested in the disposition of the proceeds of a loan and in the character of the property in which same are invested. He has a right to impose any restriction or condition upon his suretyship, whether same appears material or immaterial; but, when such condition or restriction is placed there by him, it thereby becomes material, and the creditor is required to take notice thereof at his peril. By this we do not mean to be understood as stating that a creditor is charged with the duty of seeing what disposition is made of the proceeds of a loan by the principal debtor; but we do mean to state that, if the creditor himself disposes thereof contrary to the known purposes and intentions and restrictions of the surety, such surety is thereby discharged.

We have concluded that the pleadings of appellant, with the testimony offered in support thereof, fairly raised issues of fraud and misapplication of the proceeds of the loan to be determined alone by the jury, and that the learned trial judge erred in with-

drawing these issues from the jury and determining them against the appellant. In arriving at this conclusion, we believe that we are following the principles above announced, which should be applied irrespective of any consideration of the preponderance of the testimony, and irrespective of any intentional wrong by the president of the bank.

[6] The second ground relied upon by the appellee to sustain the judgment of the trial court, based upon the elementary rule of evidence that the allegata and probata must correspond, is not tenable under the facts of this case, as we view them. The facts in this record are very meager with reference to the question of just how the Guaranty State Bank of Abilene passed into and became the Abilene State Bank. About the substance of the proof is that during the year 1922, the Abilene State Bank, having a separate charter from the Guaranty State Bank, took over the Guaranty State Bank; that the accounts which had been carried in the Guaranty State Bank were continued in the Abilene State Bank; that the officers and directors of the two banks were the same; that the stockholders were practically the same, there being but a slight difference; and that, as testified to by the former cashier of the Guaranty State Bank, "it was the same institution, you might say." About the only difference in the two institutions disclosed by the record was the difference in name, and the fact that the Abilene State Bank had a separate charter. The record does not disclose when the charter of the Abilene State Bank was procured, or whether it was an existing bank prior to the time it took over the Guaranty State Bank. Neither does it disclose whether or not the Guaranty State Bank forfeited its charter, or whether the appellee Abilene State Bank was created solely for the purpose of taking over the Guaranty State Bank. What, if anything, the Abilene State Bank paid for the assets of the Guaranty State Bank is not disclosed. Whether stock in the Abilene State Bank was issued to the stockholders of the Guaranty State Bank in lieu of their stock in such bank does not appear. There is no showing that the Abilene State Bank purchased the assets and assumed the liabilities of the Guaranty State Bank. From these meager facts it is our opinion that it does not affirmatively and conclusively appear that there was such a difference between these two institutions as to constitute them distinct, separate entities and authorize a peremptory instruction based upon the application of the rule invoked that the allegata and probata do not correspond. Practically the only evidence that the two corporations differed in identity is contained in the testimony that the appellee bank had a separate charter. That fact does not necessarily establish separate identity. If the transaction constituted a consolidation of two existing corporations, which idea is not excluded by the evidence, then there has been but an amalgamation; each corporation retaining its existence in the amalgam. In that case the consolidated corporation could be sued in its new name for the debts of its constituents. H. & T. C. Ry. Co. v. Shirley, 54 Tex. 125; Mo. Pac. Ry. Co. v. Owens, 1 White & W. Civ. Cas. Ct. App. § 386.

[7] If, as appears more probable from the meager facts in this record, the appellee bank was but a reorganization of the Guaranty State Bank, and its charter was procured to continue its business, then the question of whether or not a different entity came into existence is largely a question of intention. In the case of Ericson v. Supreme Ruling, Fraternal Mystic Circle, 105 Tex. 170, 146 S. W. 160, the Supreme Court, speaking through Chief Justice Brown, stated the rule in this language:

"When a corporation is consolidated with another or becomes merged therein, whether a new corporation is thereby created or the old corporation is continued will depend much upon the intention of the parties. Marshall on Corp. 467; 2 Clark & Marshall on Corp. pp. 974–975; Austin v. Bank, 59 Am. St. [Rep.] 547, note; Miller v. English, 21 N. J. Law, 317; First Society, etc., v. Brownell, 5 Hun [N. Y.] 464."

The case of Miller v. English, 21 N. J. Law, 317, supra, cited by Justice Brown with approval, was a case in which the charter of a religious society was lost and the same persons who constituted the board of trustees in the former corporation procured a charter for another corporation to take its place, and it was held that no new identity came into existence by the granting of the new charter. The old English authorities are reviewed, and the conclusion is drawn that the intention is determinative of the question. After discussing and citing the cases from the English courts, this language is used:

"These are, it is true, cases of royal charters of incorporation, but the same principles apply, whether the creation or removal is by the Legislature, or by a general act of incorporation. Angell & Ames on Corp. 513. The question of identity—that is, whether the new act creates a new body politic or corporate, or merely revives an old one—is one of intention. 'To ascertain whether a charter creates a new corporation, or merely continues the existence of an old one, we must,' says Story, J., 'look to its terms, and give them a construction consistent with the legislative intent, and the intent of the corporators.' Bellows v. Hallowell & Augusta Bank, 2 Mason, 43 [Fed. Cas. No. 1279]."

[8] Applying this rule to the case under consideration, it is our opinion that the facts of this case do not, within themselves, disclose any intention to create a corporation of different identity. In order to uphold the action of the trial court in withdrawing this case from the jury, it would be necessary to hold that no other effect could be given to the

transaction than that a separate entity was created, and was intended to be created when appellee bank succeeded the Guaranty State Bank. We do not wish to be understood as holding that the facts of this case disclose a consolidation of two existing banks, or a reorganization of the former bank without loss of identity; but we do state that neither of these conclusions is excluded by the testimony, and it was therefore error for the court to determine the issues against appellant without submitting them to the jury. The modern tendency of courts, and we think a tendency in the interest of justice, is to disregard the corporate fiction when same is invoked as a means of protection against fraud. To regard the corporate fiction in this case as controlling and thereby deny the appellant the right to have his issues of fact determined by a jury would, in our opinion, be resting the separate identity of a corporation, not upon a legal fiction, but upon a conclusive presumption, which the law does not recognize.

The case of Cooper Grocery Co. v. Eppler (Tex. Civ. App.) 204 S. W. 338, while not involving the exact question under discussion here, is nevertheless indicative of the view of our courts with regard to the identity of corporations having different charters. In that case a letter of guaranty was executed by two of the stockholders of Eppler Mercantile Company, a corporation, to Cooper Grocery Company, guaranteeing indebtedness then existing and thereafter to accrue until notice of the revocation of the guaranty was brought home to the grocery company. The charter of the Eppler Mercantile Company expired, and a new corporation was chartered. The old company was authorized to transact business in two cities, but limited that business to a retail business. The new corporation's charter authorized it to transact business in only one city, but empowered it to conduct both a wholesale and retail business. The new corporation became indebted to the wholesale house, and suit was filed thereon against the guarantors, who defended on the ground that they did not guarantee the payment of indebtedness of this new corporation. Notwithstanding the strictness with which contracts of guaranty are enforced in favor of the guarantors, the Austin Court of Civil Appeals held that the guarantors were bound for the debts of such new corporation, which came into existence after the guaranty was executed. It seems to us that, if the two corporations in that case were sufficiently identical to warrant a judgment against a surety for the debts of the one which came into existence as a successor to the other, upon a contract of guaranty covering the debts of the former, then clearly the facts in this case do not justify the conclusion that the two corporations in this case were so separate and distinct as that appellant's rights to show fraud in the execution of the note sued upon should

be determined by the general rule that he must prove the case alleged. We do not believe that the rule has any application to this case. Appellant alleged fraud in the original transaction, and showed that the appellee bank was claiming the benefit of the alleged fraud; he also showed that the officers of the two banks regarded them as the same institution.

[9] It is the established rule in our state that, for a variance to be fatal, it must be material. To be material, it must be such as to mislead or surprise the adverse party. McClelland v. Smith, 3 Tex. 210; Hays v. Samuels, 55 Tex. 560; Wiebusch v. Taylor, 64 Tex. 53; Brown v. Sullivan, 71 Tex. 470, 10 S. W. 288; McDonald v. Cabiness, 100 Tex. 615, 102 S. W. 721; Cullers et al. v. May et al., 81 Tex. 110, 16 S. W. 813; Jones v. S. G. Davis Motor Car Co. (Tex. Civ. App.) 224 S. W. 701.

[10] It cannot be contended that the appellee was either misled or surprised in this case. It had its witnesses present' and met the issues by testimony. The case was tried as if the issue were an issue of fact regarding fraud. No objection was made to the admissibility of any evidence on account of its variance, and it would not be consonant with our ideas of justice to permit it to reap the benefits of the alleged fraud, if, in fact, such fraud was perpetrated, on the bare ground that appellant's answer alleged that the fraud was committed by it instead of its alter ego.

Besides this, the testimony, in our opinion, takes out of the case any question of variance. A. E. Poole, president of appellee bank and former president of the Guaranty State Bank, testified, "When this bank was organized, it was known as the Guaranty State Bank;" and, further, "I was representing this bank in making the loan." With this testimony in the record given by the president of the appellee bank, we can see no ground for the claim that appellant proved a different defense to that alleged. We therefore conclude that the judgment of the trial court cannot be sustained upon the second ground relied upon by appellee.

[11, 12] We do not believe that from the record in this case we would be justified in holding, as a matter of law, that the appellant was put upon notice of such facts as would have, by the exercise of ordinary diligence, led him to discover, prior to the execution of the note sued on, that the money had been applied to a pre-existing indebtedness of Matthews. The question of actual notice and of diligence in making inquiry in this case was, in our opinion, purely a question of fact to be determined by the jury. At most, there could be no more than a presumption. Presumptions must yield to positive testimony of facts. Appellant testified positively that he had no knowledge of the appli-

cation made of the proceeds of the original note until after the execution of the note sued upon, and A. E. Poole, president of the plaintiff bank, testified that he gave him no information of such facts prior to that time, and that, so far as he knew, appellant knew nothing of it until after the last renewal. The fact that Cozart was the son-in-law of Goodwin raises no presumption that he informed appellant of the facts within his knowledge. The record does not lend any strength to such presumption, because it is disclosed by the testimony of A. E. Poole that, before the note was executed, he informed Cozart that it would require $17,000 as operating capital, and was informed by Cozart that he did not want "to hit Mr. Goodwin up too hard." We do not think it is within the province of this court to resolve this issue of fact against the appellant, but that the jury alone should have passed upon same under appropriate instructions. The question of actual notice is one of fact for the jury. 29 Cyc. 1129, § (c), and authorities there cited.

Chief Justice Wheeler of our Supreme Court, in the early history of our jurisprudence, wrote upon this question in his opinion in the case of Briscoe v. Bronaugh, 1 Tex. 326, 46 Am. Dec. 108, and the distinction there drawn between the province of the court and that of the jury should be carefully recognized and applied. We quote from that able opinion as follows:

"Of the weight of evidence they are the judges. The law, it has been said, has no scales wherein to weigh the different degrees of probability; still less to ascertain what weight of evidence shall amount to proof of any disputed fact. Its business is to define, to distinguish, and to apply legal consequences to ascertained facts; but, whether a fact be probable or improbable, true or false, admits of no legal definition. The law therefore refers the weight of evidence, and of the different degrees of probability to the jury, who are to be guided in their decision by their conscientious judgment and belief under all the circumstances of the case."

We believe that the foregoing quotation is applicable, not only to the question of notice and ratification, but to every other issue in this case, all of which were withdrawn by the court from the consideration of the jury, and, so believing, it is our opinion that the judgment of the trial court should be set aside, and that this case should be remanded for further proceedings not inconsistent with this opinion, and it is so ordered.

Reversed and remanded.

PANNILL, C. J. (dissenting). Believing that a reversal of this case violates fundamental principles, both of procedure and substantive law, I am compelled to enter my dissent. The suit was by the Abilene State Bank on a note executed by appellant to it. Appellant answered that the note was a renewal of another note executed by him, and that the execution of the original note was procured by the fraud of the "plaintiff bank." The substance of the allegations charging fraud have been set out in the majority opinion. Nowhere in the answer was there any suggestion that there was any connection between the plaintiff bank and any other bank in respect to either the original or renewal note. But in each instance in which the names of those connected with the transaction are stated, it is distinctly alleged that the transactions were had between the appellant and the Abilene State Bank or its agents. It appears to be conceded that the answer alleged fraud on the part of the Abilene State Bank only. The evidence shows conclusively that the transactions complained of in appellant's answer were had with the Guaranty State Bank. The substance of the testimony relating to any supposed connection between the Guaranty State Bank and the Abilene State Bank is stated in the majority opinion. The evidence further shows that the indebtedness of Matthews in the approximate sum of $6,000, which was charged against the account of Cozart and Matthews, was not due the Abilene State Bank as alleged, and that the Abilene State Bank did not charge said indebtedness against the proceeds of the note executed by appellant, and that the Abilene State Bank nor any of its agents had anything to do with the transactions of which appellant complains, unless the evidence is sufficient to show that the Abilene State Bank is the same institution as the Guaranty State Bank, but operating under another name, and as to that matter more will be said later.

The burden was upon appellant to prove the fraud alleged and that it was perpetrated on him by the Abilene State Bank. It is elementary that the burden of proof is always on a party asserting a matter; on the plaintiff as to his cause of action, and on the defendant as to his matters of defense. It is fundamental that in all legal proceedings the allegata and probata must correspond, and this rule is as applicable to the answer of the defendant as it is to the petition of the plaintiff. Bank of Garvin v. Freeman, 107 Tex. 523, 181 S. W. 187.

These rules are not denied in the majority opinion, but are thought to have been complied with on two grounds. First, because it is concluded that the evidence is sufficient to raise the issue as to the liability of the Abilene State Bank for the liabilities of the Guaranty State Bank. While not disposed to concede this contention, I do not believe that, if conceded, it would destroy the effect of the variance between the allegations and the proof. It is more a question of identity. The reports are replete with cases where a fatal variance was found between the pleadings and the proof, even though the proof showed liability on the part of the party sought to be charged. The holding of the ma-

jority that there is no variance is distinctly predicated upon the fact that the facts introduced do not necessarily establish separate identity. This, in and of itself, in my judgment, is fatal to the proof, so far as the appellant's claim is concerned, that the proof corresponds to the allegations. As stated, the burden of proof was upon the appellant to prove that the fraud was perpetrated upon him by the Abilene State Bank, and this he could not do by offering testimony which did not disprove the fact asserted. He could not, by failure of proof, raise an issue where the burden to prove such issue was plainly upon him. A few recent decisions thought to sustain the views suggested will be referred to. New Amsterdam Casualty Co. v. Harrington (Tex. Com. App.) 290 S. W. 726. Numerous other authorities supporting this rule are available. Western Union Telegraph Co. v. Smith, 88 Tex. 9, 28 S. W. 931, 30 S. W. 549; Maddox v. Summerlin, 92 Tex. 483, 49 S. W. 1033, 50 S. W. 567; Lewis v. Hatton, 86 Tex. 533, 26 S. W. 50; Bates v. Dipple (Tex. Civ. App.) 242 S. W. 541; Schulz v. Annick (Tex. Civ. App.) 29 S. W. 916.

In this case, all the light that appellant saw fit to give to the trial court and the jury on his allegations that fraud had been perpetrated on him by the Abilene State Bank, was proof that the note in question was a renewal of the note executed by him to the Guaranty State Bank of Abilene, and that later on the Abilene State Bank took over the assets of the Guaranty State Bank, and that the Abilene State Bank had the same officers as the Guaranty State Bank but different stockholders. This is not sufficient, in my judgment, to show that the Guaranty State Bank and the Abilene State Bank were the same legal entity. Proof that two corporations have each the same stockholders and the same officers and the same directors does not prove that they are the same legal entity. Corsicana Transit Co. v. Walton (Tex. Civ. App.) 189 S. W. 307. In the above case, the decision of the Court of Civil Appeals was affirmed and the opinion adopted by the Supreme Court under the style of Walton v. Corsicana Transit Co., 222 S. W. 979.

In the New Amsterdam v. Harrington Case, supra, it was clearly held that an allegation that Gragg was the employer of the defendant was not sustained by proof of his employment by a copartnership of which Gragg was a member, although Gragg, as well as the copartnership, would be liable at common law for any injury caused by their negligence and sustained by Harrington in the course of his employment.

The majority opinion seems to proceed upon the idea that, because from the evidence separate identity is not conclusively established, or because the evidence did not exclude the idea that there had been a consolidation of the two existing corporations, the allegation that the fraud had been perpetrated by the plaintiff bank was sufficient to make an issue to go to the jury. If I have not misconstrued the theory upon which the holding is predicated, it amounts to saying that, although the evidence does not show that there is a coincidence of identity between the Abilene State Bank and the Guaranty State Bank, and although this is a case where the burden is on the appellant to show that there was a coincidence of identity, such failure to prove what is alleged is sufficient to take the matter to the jury. This is curious law to me, and amounts in my mind to an assumption that the Guaranty State Bank and the Abilene State Bank were, in fact, but one and the same corporation, operating at different times under different names. It is not enough, in my judgment, for a party to make out a case to merely raise a surmise or conjecture that the facts may be as alleged by him, but he must prove that such a state of facts does not exist, or offer testimony from which such conclusion may, as a matter of fact, be drawn. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

Brought to its last analysis, the holding appears to be that, where it is shown that one corporation takes over the assets of another corporation, and thereafter employs the same officers, there is a presumption that there has been a consolidation or amalgamation of the two.

Resort has also been made in the majority opinion to the rule that variance, to be fatal, must be material and such as is calculated to mislead or surprise the adverse party. Reference is made to a number of cases applying this rule, but they are cases where the precise transaction relied on was pleaded, but a mistake had been made as to the names or dates. In most instances the names were "idem sonans," and the conclusion seems to have been reached by the majority that this rule requires a showing of actual surprise. I do not believe that its application can be invoked in this case. If the rule was as applied in this case, the decision in New Amsterdam Casualty Co., supra, should not have been made, nor would the Supreme Court have held as it did in the case of Western Union Telegraph Co. v. Smith, cited in the case last above referred to. In neither case was the element of surprise presented, and particularly was it absent in the New Amsterdam Casualty Co. Case. Obviously, where a party pleads one transaction and proves another, the rule can have no application, for such a situation presents but the fundamental question that a party cannot recover upon a cause of action nor assert a defense which is not pleaded.

The last proposition which is seemed to be relied on is statements from Poole quoted in the majority opinion. These certainly

cannot be held to refer to the Abilene State Bank.

The writer presents another reason why he thinks appellant is precluded from a recovery in this case, and this comes under the rule that the maker of a note procured by a fraud by a renewal of it, waives all defenses of which he had knowledge at the time of the execution of the renewal or which he could have discovered by the exercise of ordinary diligence. If he is in possession of the facts which put him upon inquiry, it then becomes his duty to make such inquiry before executing the renewal, and, if he fails to do so, he is as much bound as if he had knowledge thereof. 3 R. C. L., titles "Bills and Notes," § 321; Padgett v. Lewis, 54 Fla. 177, 45 So. 29; Twichell v. Klinke (Tex. Civ. App.) 272 S. W. 283; Roess Lumber Co. v. State Exchange Bank, 68 Fla. 324, 67 So. 188, L. R. A. 1918E, p. 297, Ann. Cas. 1916B, 327.

It appears from the undisputed evidence in this case that appellant renewed the note in controversy seven times after it was acquired by the Abilene State Bank. These renewals covered a period of practically two years. On May 2, 1922, appellant executed a guaranty to induce the plaintiff bank to extend to appellant's said son-in-law, Cozart, $4,000, and in said guaranty represented that the $7,000 note which was then held by the appellee was a valid obligation. It further appears that appellant and his son-in-law were on good terms during the whole time of this transaction, and lived in the same city where the transactions occurred. If a case was ever presented where the undisputed facts showed a duty to inquire, it seems that this is one.

I am not unmindful of the rule that, where there is an issue of fact, regardless of how weak the evidence may be in probative force, the question is one for a jury. Appellant's claim of fraud rests solely upon his contention that he borrowed this money for the purpose of furnishing new capital for the enterprise. His attention was called pertinently and directly on the part of the bank to this matter by demands for renewals of this paper and with knowledge that nothing had been paid at any time upon the principal. At the time of the last renewal, he executed the guaranty referred to. I cannot conceive how a jury could find, or their findings could be sustained by the evidence, that a person of ordinary prudence would not have made some inquiry of Cozart or the bank as to the condition of the affairs of the firm of Cozart and Matthews or as to what had become of the $7,000 which appellant claims he borrowed for capital for the firm.

There is not, to my mind, a question of presumption. The appellant was on the stand, and testified that he had no knowledge of the application of the bank of the money to Matthews' debts, or of the existence of the indebtedness of Matthews to the bank, but he was silent as to whether he made an inquiry. If he had inquired, he would have performed his duty, and could have relied upon the information which he received, but, having made no inquiry, the law puts him upon notice of all the facts which the inquiry would have disclosed. The presumption, in my judgment, has been placed the other way around. In order to absolve him from the consequence of his failure, it seems necessary to presume that he did inquire.

Other matters might be discussed, but the above are sufficient to illustrate my view as to why the judgment of the trial court should be affirmed.

### On Appellee's Motion for Rehearing.

HICKMAN, J. Appellee seems to have construed our opinion as holding that, in the absence of proof to the contrary, it will be presumed that the two banks were the same institution. We cannot understand how the opinion could be so construed. Certainly the burden is on a party alleging a fact to prove it. What we hold is that appellant discharged the burden and made out a prima facie case of identity, which was not as a matter of law overcome, and it was therefore error to withdraw the case from the jury. We will quote practically all of the material testimony in the record which seems to bear upon this subject. A. E. Poole, president of the Abilene State Bank and former president of the Guaranty State Bank, testified:

"That was the Guaranty State Bank at that time. Since that time the Guaranty State Bank has gone out of business and the Abilene State Bank has taken its place."

"When this bank was organized, it was known as the Guaranty State Bank."

"Answering if it is not a fact that it was afterwards taken over by the same people and run, and was the same bank with the exception of a different name, it was run under a different name and there were some different stockholders. The Abilene State Bank took all of its business over. As to it being true that it belongs to the same institution, with some different stockholders, it was taken over by the Abilene State Bank."

"I was representing this bank in making the loan."

Sam Swan, cashier of the Guaranty State Bank at the time it was taken over by the Abilene State Bank, and who was also cashier of the Abilene State Bank until July, 1922, testified:

"I think the Abilene State Bank took over the Guaranty State Bank about May, 1922. The Abilene State Bank had a different charter from the other bank. There is very little difference in the stockholders. *The Abilene State Bank was reorganized with practically the same stockholders.* In other words, if you had

an account in there it was carried right on. *It was the same institution, you might say."* (Italics ours.)

This testimony, in our opinion, was sufficient to make out a prima facie case that the Abilene State Bank was but a reorganization of the Guaranty State Bank, and that they were the same institution. The question which we discussed was whether or not the mere fact that one witness testified that appellee bank had a different charter within itself, as a matter of law, overcame this prima facie case conclusively and warranted the giving of a peremptory instruction against appellant. Under the authorities cited in our former opinion, we held that it did not have this effect. We quoted from our Supreme Court, speaking through Chief Justice Brown. A study of the opinion there cited, together with the opinion of the Court of Civil Appeals in that same case reported under the style of Supreme Ruling of Fraternal Mystic Circle v. Ericson, 131 S. W. 92, discloses that in that case the two corporations had separate charters. Six of the incorporators of the second corporation were not even members of the first, and, for a short time after the creation of the second, each was carrying on business. The Court of Civil Appeals held, as a matter of law, that the trial court erred in holding the two corporations were one and the same. The Supreme Court reversed the decision of the Court of Civil Appeals on this point, and held that the fact of separate charters did not, as a matter of law, constitute the two corporations separate entities. The other authorities cited support the proposition. It is interestingly discussed in the Eppler Case cited by us, but the exact point not decided. The New Jersey case clearly decides it. If there is any authority to the contrary, able counsel have not cited this court to it.

Appellee calls upon the court for additional findings of fact. In response to the request, we find that about February, 1922, Cozart bought out Matthews' interest in the business, and at that time appellant, Goodwin, knew the condition of the business, what was in it, the value of it and everything of that kind. That is a substantial statement of the testimony of appellant. We do not find, however, any testimony that appellant knew at that time what application had been made of the proceeds of the original loan. We find that on May 2, 1922, appellant executed the following instrument:

"Abilene, Texas, May second, 1922.

"Abilene State Bank, Abilene, Texas—Gentlemen: In order that D. E. Cozart may handle his business to a better advantage, it seems necessary that his line of credit with your bank be increased. In addition to the $7,000 note, which I have executed with D. E. Cozart, this is your authority to extend him an additional line not to exceed $4,000, and for which he will from time to time execute his promissory note, which notes will be for short time.

"I hereby bind myself to protect such line of credit and guarantee said Abilene State Bank against any loss from such transactions.

"Yours truly,       W. C. Goodwin."

We find that no officer of the bank was ever asked by appellant a specific question as to the amount of the liabilities of Matthews or of what assets he had at the time the original note was executed. We find that these specific inquiries were not made, but that the inquiry as to Matthews' business as disclosed in our opinion called for any information within the bank's knowledge.

We find that Cozart, in buying into the business of Matthews, became a partner with him, acquiring a one-half partnership interest with Matthews in the assets of the business. We do not find that Cozart assumed any liabilities. He denied that fact.

We find that there is no testimony in the record to the effect that the business of buying and selling grain and flour is not a good business; the testimony being silent on this point.

We are requested to find that Goodwin made no inquiries of any one until about November, 1923, as to what application was made of the proceeds of the original note. We cannot so find. The record discloses that no inquiry was made of Poole until that time, but there is no testimony that inquiry was not made by Goodwin of other persons.

We are asked to find that both of the banks were corporations having separate charters and were separate entities. We devoted a good portion of our opinion in trying to say that it was not conclusively shown that they were separate entities, and cannot, therefore, find that they were separate entities. We find that the Abilene State Bank had a different charter to that of the Guaranty State Bank; each being a corporation. We find that the Guaranty State Bank ceased to do business, and the Abilene State Bank took over all of its assets on May 1, 1922, and continued to do the same character of business in the same location.

Attorneys for appellee request a finding that:

"The proceeds of the $7,000 note, discounted in November, 1921, was credited to the account of Matthews & Cozart in the Abilene State Bank, and shortly thereafter approximately $6,000 of the proceeds of this note was credited to the bill of exchange of Matthews and charged against the account of Matthews & Cozart by the Abilene State Bank. The indebtedness of Matthews so charged against the account of Matthews & Cozart was a bill of exchange and a liability of the firm of Matthews & Cozart."

We do not find that the bill of exchange was a liability of the firm of Matthews & Cozart, because such liability is denied by

Cozart. It is indeed interesting to note that trained and learned counsel, familiar with all the evidence concerning the facts and circumstances surrounding the execution of the original note, should, in this request, refer to the Abilene State Bank as the bank which appropriated about $6,000 to the payment of Matthews' debt to it. This probata would certainly correspond with the allegata. However strongly the evidence may suggest that this bank was the alter ego of the other, consistency requires that we still adhere to the holding that the evidence on this question raised a fact issue to be determined by the jury.

The other findings requested are clearly covered in our former opinion.

We have carefully considered the motion for rehearing, but, being convinced that the testimony raised issues of fact which should have been determined by the jury, the motion is overruled.