## REAGAN COUNTY PURCHASING CO. v. BIG LAKE OIL CO.
### No. 3180.

Court of Civil Appeals of Texas. El Paso. March 28, 1935.

Rehearing Denied April 18, 1935.

562

Burney Braly, John A. Braly, and G. R. Pate, all of Fort Worth, for appellant.

Robert T. Neill, of San Angelo, Hiner & Pannill, of Fort Worth, and J. C. Adams, of Tulsa, Okl., for appellee.

HIGGINS, Justice.

This is a suit to recover damages brought by the appellant against the appellee for alleged breach of a crude oil sales contract dated November 24, 1924.

At the conclusion of the plaintiff's evidence the defendant moved for an instructed verdict which was granted.

The question at issue is controlled by the proper interpretation of the sales contract which is very lengthy.

Those portions of the contract controlling the controversy read:

"This Agreement is entered into and made between Big Lake Oil Company, a corporation organized under the laws of the State of Delaware, hereinafter called Big Lake Company; the Texon Oil and Land Company, a corporation organized under the laws of the State of Delaware, Group No. 1 Oil Corporation, a corporation organized under the laws of the State of Delaware, Group No. 2 Oil Corporation, a corporation organized under the laws of the State of Delaware, (said last three named corporations are hereinafter sometimes referred to as and called the Texon Corporations), and Frank Gordon, Haymon Krupp, Elias G. Krupp, and Frank T. Pickrell, all of El Paso, State of Texas, hereinafter called Trustee, parties of the first part, all hereinafter some times referred to as and called Producers; and Reagan County Purchasing Company, Inc., a corporation organized under the laws of the State of Delaware, as party of the second part, hereinafter called the Purchasing Company;

"Witnesseth:

"Whereas, Big Lake Company is the owner of oil and gas leasehold estates and all rights incident thereto created by virtue of oil and gas leases issued by the Commissioner of the General Land Office of the State of Texas, in, to and upon the following described tracts of State University lands of the State of Texas situate in the County of Reagan, State of Texas, to-wit: (Here follows description of lands) all said tracts of land hereinafter sometimes referred to as the Big Lake Lands; and

"Whereas, one or more of the Texon Corporations are the owners of oil and gas leasehold estates and all rights incident thereto,

created by virtue of oil and gas leases, issued by the Commissioner of the General Land Office of the State of Texas thereon, in, to, and upon the following described tracts of State University lands of the State of Texas situate in the County of Reagan, State of Texas, as follows, to-wit: (Here follows description of lands) Hereinafter sometimes referred to as the Texon Lands; and

"Whereas the record title to each of the aforesaid leasehold estates of the Texon Corporations is now held by and in the name of some one of the Trustees who holds the same for the benefit of one or more of said Texon Corporations; and

"Whereas the Producers have developed an oil field on said leasehold estates to the extent that they are producing an aggregate daily production of approximately five thousand (5,000) barrels of high gravity petroleum oil, and

"Whereas, the Producers desire to further develop and operate their said leasehold estates in order to produce, remove from and market the petroleum oil produced from said Big Lake Lands and Texon Lands, but are unable to do so because the Producers now have at or near said leasehold estates no sufficient market upon which to market and sell the petroleum oil which is now being produced by them, or that may hereafter be produced by them from their said leasehold estates; and

"Whereas, said leasehold estates are located some two hundred miles distant from any oil trunk pipe line available for the transportation of the oil produced by the Producers to market and are located in proximity to only one railroad which is inadequate for economically transporting the oil produced from said leasehold estates to market, and the Producers have no market for but a small part of said oil and it is impracticable for them to build storage tanks and store the oil being produced, and desired to be produced by them, and it is necessary that the Producers, in order that they may properly develop and operate their said leasehold estates, obtain a dependable market for all or a large part of the oil produced by them from their leasehold estates; and

"Whereas, although the Purchasing Company now has no receiving or storage tanks at or near the Producers' said leasehold estates and has no system of gathering pipe lines to gather and transport said oil to receiving and storage tanks, the Purchasing Company, in order to produce an exclusive sale to it of all oil produced by the Producers from said leasehold estates not exceeding the

amounts hereinafter stipulated, is willing to construct, at some point or points in the vicinity of said leasehold estates to be determined by the Purchasing Company, receiving and storage tanks, pipe line or lines, pump stations, other equipment and facilities necessary for gathering and transporting the oil produced by the Producers from their said leasehold estates to the receiving and storage tanks of the Purchasing Company so constructed, if the Producers will sell to the Purchasing Company all of the petroleum oil produced and removed by them from said Big Lake Lands and Texon Lands, during the present terms of said leasehold estates and of all extensions and/or renewals thereof up to but not exceeding the amounts hereinafter stipulated;

"Now, therefore, it is agreed between the Producers and the Purchasing Company, as follows, to-wit:

"Article I. The Producers agree to sell and hereby sell to the Purchasing Company, and the Purchasing Company agrees to buy and hereby buys from the Producers if, as and when produced and removed, all petroleum oil produced and removed from said Big Lake Lands and Texon Lands by Producers, and/or by their sub-lessees, grantees, assignees or successors in interest under their said Leasehold Estates, during the period of time from and including the First day of March, 1925, up to and including the First day of December, 1925, up to but not exceeding, except as hereinafter provided, Ten thousand (10,000) barrels per day.

"Article II. The Producers agree to sell and hereby sell to the Purchasing Company and the Purchasing Company agrees to buy and hereby buys from the Producers if, as and when produced and removed, all petroleum oil produced and removed from said Big Lake Lands and Texon Lands by Producers and/or by their sub-lessees, grantees, assignees, or successors in interest under their said Leasehold Estates, from and after the First day of December, 1925, during the term of said Leasehold Estates and of any and all extensions and/or renewals thereof up to, but not exceeding, except as hereinafter provided, Twenty thousand (20,000) barrels per day.

"Article III. All oil produced by the Producers from said Leasehold Estates from day to day in excess of the amounts required to make delivery to the Purchasing Company of the maximum quantity of oil per day sold under this agreement to the Purchasing Company by the Producers shall be stored by such respective Producers in the storage tanks pro-

vided by them at any time when and so long as the aggregate amount of such oil so stored, under this agreement, hereinafter in this agreement called Reserve Oil, shall be less than three hundred thousand (300,000) barrels, provided that the Texon Corporations and/or their sub-lessees, grantees, assigns and successors in interest, hereinafter in this agreement sometimes referred to and called the Texon Group, shall not be required to store any of such oil whenever and so long as the aggregate amount of such Reserve Oil held in storage tanks of said Texon Group shall be not less than one hundred and fifty thousand (150,000) barrels, and provided that the Big Lake Company and/or its sub-lessees, grantees, assigns and successors in interest, hereinafter in this agreement sometimes referred to and called the Big Lake Group, shall not be required to store any of such oil whenever, and so long as the aggregate amount of such Reserve Oil held in the storage tanks of said Big Lake Group shall not be less than One hundred and fifty thousand (150,000) barrels.

"All oil produced by the Producers during the term of this agreement from their said Leasehold Estates when not required as and when produced for delivery to the Purchasing Company in order to deliver the maximum amounts which by this agreement the Producers agree to sell daily to the Purchasing Company, and/or to supply and make up any deficit in such maximum amount of daily sales to the Purchasing Company, as hereinafter provided, and/or to maintain the amount of Reserve Oil of such Texon Group and Big Lake Group, respectively, in the amount of One hundred and fifty thousand (150,000) barrels by each, shall be considered as free oil and may be sold, used or otherwise disposed of by the Producers as they may respectively elect.

"Article IV. If between the First day of March, 1925, and the First day of December, 1925, inclusive, the Producers shall during any two consecutive calendar months fail to produce from said Leasehold Estates petroleum oil in aggregate quantity equivalent to ten thousand (10,000) barrels per day during said two consecutive calendar months, and if during the succeeding two consecutive calendar months the Producers shall have any Reserve Oil and/or shall produce from said leasehold estates more than ten thousand (10,000) barrels per day, the Producers shall sell and deliver to The Purchasing Company and the Purchasing Company shall buy and receive from the Producers during the succeeding two consecutive calendar months out of such Re-

serve Oil and/or from the oil daily produced by the Producers during said two consecutive calendar months in excess of ten thousand (10,000) barrels per day, a sufficient quantity of oil to equal such deficit.

"Article V. If after the First day of December, 1925, during the period of time for which the Producers agree to sell and deliver oil to the Purchasing Company and the Purchasing Company agrees to buy oil from the Producers under this agreement, the Producers shall during any two consecutive calendar months fail to produce from said Leasehold Estates and deliver to the Purchasing Company petroleum oil in the aggregate quantity equivalent to twenty thousand (20,000) barrels per day during said two consecutive calendar months, and if during the succeeding two consecutive calendar months the Producers shall have any Reserve Oil and/or shall produce from said leasehold estates more than twenty thousand (20,000) barrels per day, the Producers shall sell and deliver to the Purchasing Company and the Purchasing Company shall buy and receive from the Producers out of such Reserve Oil, and/or from the oil daily produced by the Producers during said two consecutive calendar months in excess of twenty thousand (20,000) barrels per day, a sufficient quantity of oil to equal such deficit.

"Article VI. Whenever and so long as the Texon Group shall produce under the aforesaid leasehold estates of the Texon Corporations from the Texon Lands petroleum oil equal to or in excess of fifty (50%) per cent of the maximum daily quantities, which when produced is to be sold and delivered by the Producers to the Purchasing Company, as provided in Articles IV and V hereof, and whenever and so long as the Big Lake Group shall produce under the aforesaid leasehold estates of the Big Lake Company from the Big Lake Lands petroleum oil equal to or in excess of fifty (50%) per cent of the maximum daily quantities, which when produced is to be sold and delivered by the Producers to the Purchasing Company as provided in Articles IV and V hereof, said Texon Group and Big Lake Group shall be entitled respectively to deliver to the Purchasing Company and the Purchasing Company shall receive from said Texon Group and Big Lake Group respectively Fifty (50%) per cent of the maximum daily quantities of petroleum oil agreed to be sold and delivered by the Producers to the Purchasing Company as provided in aforesaid Articles IV and V hereof.

"Whenever and so long as either the Texon Group or the Big Lake Group shall during any two consecutive calendar months fail to deliver an aggregate quantity of petroleum oil, equal to fifty (50%) per cent of the aggregate amount agreed, when produced, to be sold and delivered by the Producers to the Purchasing Company during any such two consecutive calendar months as provided in Articles IV and V hereof and shall not have at the beginning of the succeeding two consecutive calendar months Reserve Oil and/or daily production in excess of fifty per cent (50%) of the daily maximum amounts required to be sold and delivered by such group to the Purchasing Company during said succeeding two consecutive calendar months sufficient in amount for such Group to supply and deliver therefrom to the Purchasing Company, its aforesaid deficit, for the two preceding consecutive calendar months; and if the other group shall at any time during said succeeding two consecutive months have Reserve Oil and/or a daily production of oil in excess of fifty (50%) per cent of the daily maximum amount required to be sold by the Producers to the Purchasing Company during said succeeding two consecutive calendar months, then such other group agrees, from such Reserve Oil and/or excess daily production, not required to supply and deliver any deficit quantity of oil it may then be due the Purchasing Company to deliver, to supply and make up for the other said group its deficit for the preceding two consecutive calendar months which the Purchasing Company agrees to purchase; provided the Purchasing Company shall, when either the Texon Group or the Big Lake Group shall during and two consecutive calendar months have a deficit in delivery of oil due to the Purchasing Company, within ten (10) days after the expiration of such two consecutive calendar months give notice in writing to all of the Producers of either of said Groups, who shall be at said time producing oil, in which shall be stated by the Purchasing Company, the amount of such deficit.

"Whenever and so long as the total daily production of the Producers, either of the Texon Group or of the Big Lake Group, shall exceed the maximum amount of oil said respective group is required or entitled to sell and deliver to the Purchasing Company under this agreement, the amount which each Producer in such Group shall be entitled to sell and deliver to the Purchasing Company, so long as said condition obtains, shall be that pro rata part of the total amount of oil such Group is required to sell and entitled to deliver to the Purchasing Company and the Purchasing Company is required to buy from

such Group that the daily production of such Producer which is tendered by it to the Purchasing Company is to the total production of all the Producers of said Group which is tendered by the Producers of said Group to the Purchasing Company. * * *

"Article XVII. It is agreed that each of the Producers has entered into and executed this agreement each for itself and/or himself severally and not for any other in any wise and with reference only to its and/or his aforesaid respective leasehold estates and the oil produced therefrom, and under no circumstances shall any of said Producers be held responsible or liable for the acts and/or obligations and undertakings under this agreement, or any other Producers, except to sell and deliver to the Purchasing Company oil produced by it or him, to supply and make up any deficit of oil resulting from the failure of any group of Producers to deliver the quantity of oil required during any two consecutive calendar months, as provided in Article VI.

"It is understood and agreed that the liability of the Trustees under this agreement to the Purchasing Company is not and shall not be personal, but is and shall be limited only to binding the leasehold estates standing of record in their respective names and the oil produced therefrom, and each of said Trustees shall be respectively discharged from all further obligations under this agreement as and when he shall convey, subject to the provisions of this agreement, the record title to all leasehold estates held by him to the persons or corporations for whose benefit he holds the same, or to the nominee of such persons or corporations."

Prior to the execution of the contract oil had been discovered and was then being produced on some of the lands held by the Big Lake Company and Group No. 1 Oil Corporation, and since the date of the contract said lands have continued to produce oil. The Texon Oil & Land Company and Group No. 2 Oil Corporation have not produced any oil.

The plaintiff had a resale contract with the Humble Oil & Refining Company for the oil it had purchased under the contract, at an advance price of 20 cents per barrel.

The plaintiff's petition is lengthy. We will state only the pertinent facts disclosed thereby as follows:

During the months of July and August, 1932, the Group No. 1 Oil Corporation failed to the extent of 46,005.12 barrels to deliver its quota (50 per cent. or 10,000 barrels a day) of the oil agreed to be sold during those months. During the months of September and October, 1932, said corporation failed to the extent of 214,682.76 barrels to deliver its said quota during those months.

During the months of January and February, 1933, said corporation failed to the extent of 239,222.36 barrels to deliver its said quota during those months.

Timely notices of these deficits were given by plaintiff to defendant and demand made of defendant that it make up such deficits. It was further alleged that during the months of September and October, 1932, defendant made up and delivered the said deficit for July and August, but to the extent of 45,942.35 barrels failed to make up and deliver the said deficit of 214,682.76 barrels for the months of September and October, to plaintiff's damage in the sum of $9,188.47.

In March and April, 1933, defendant made up and delivered 134,071.76 barrels of the deficit for January and February, 1933, leaving a net deficit for those months of 71,315.66, which deficit defendant refused to make up and deliver, to plaintiff's damage in the sum of $14,263.13.

Other allegations show the inability of Group No. 1 Oil Corporation to deliver its daily quota during all of the months stated and ability of defendant in November and December, 1932, to make up the net deficit for the months of September and October, 1932.

Allegations were also made that defendant sold large quantities of oil to the Texas Company and others, thereby reducing its reserve oil in storage below the minimum of 150,000 barrels permitted by the contract, and that but for such other sales defendant would have had sufficient oil to deliver its own daily quota and the said net deficit of Group No. 1 Oil Corporation of 71,315.66 barrels for January and February, 1933.

The defendant answered by general demurrer and general denial. It also set up a cross-action which need not be stated, as it was dismissed by defendant when its motion for an instructed verdict was sustained, thereby passing out of the case.

As showing appellee's theory of the evidence and controlling question in the case, we quote from its brief:

"The first notice shown by the record to appellee was the notice of September 10, 1932, wherein appellant gave notice to appellee to make up an alleged deficit in deliveries of Group No. 1 Oil Corporation for the two consecutive calendar months of July and August,

1932, of 46,005.12 barrels of oil, alleged to be delivered under the contract. No prior demand of any previous deficit in months previous to July and August, 1932, was either pleaded or proved. Appellant's evidence showed that on July 1st, 1932, Group No. 1 Oil Corporation had in its tanks 79,204.04 barrels of oil. That in July and August said Group No. 1 delivered to appellant 592,833.58 barrels and that on September 1st, 1932, said Group No. 1 had in its tanks on its leases oil covered by the contract in question amounting to 74,727.25 barrels. Appellee's contention as to this period is, first, that there was in fact no deficit, because both at the beginning and end of the period Group No. 1 had in its storage tanks, oil which it could and should have delivered under the contract to appellant, far in excess of the difference between its quota of 620,000 barrels and its actual deliveries of 592,833.58 barrels.

"Appellant's proof further showed that, based upon this demand of September 10, 1932, appellee delivered to appellant during the two succeeding months of September and October, 1932, 657,221.87 barrels of oil, with a consequent over-delivery if said demand had been correct, of 1,216.75 barrels; but with an actual over-delivery due to said incorrect demand, of 47,221.87 barrels.

"Appellant's evidence further showed that for the next ensuing two months, of November and December, 1932, Group No. 1 delivered to appellant 444,686.81 barrels; that it had in storage at the beginning of said period, 69,555.64 barrels and at the end of said two months period it had in storage 45,570.56 barrels. That during said two months period appellee delivered to appellant 777,523.66 barrels. That the quotas for both Group No. 1 and Big Lake Oil Company during said two months period was 610,000 barrels each. That for the next ensuing two months, January and February, 1933, Group No. 1 delivered to appellant 350,777.64 barrels, and that appellee delivered to appellant 756,086.64 barrels; and that Group No. 1 had in its tanks on January 1st, 1933, 45,570.56 barrels; that the quotas for Group No. 1 and appellee during said period of January and February, 1933, were 590,000 barrels each.

"Further, that during March and April, 1933, Group No. 1 delivered to Appellant 475,928.24 barrels and appellee delivered to appellant 777,133.25 barrels. And that Group No. 1 had in its tanks on March 1st, 1933, 78,212.43 barrels.

"Reduced to its most simple form, the question to be decided by this Court is whether under the provisions of the contract in question appellant could charge appellee with the deficit of Group No. 1 during the months of September and October, 1932, of 45,942.35 barrels, when its own proof showed that on September 1st, 1932, said Group No. 1 Corporation had on hand on its leases in its tanks, 74,727.25 barrels; and on November 1st, 1932, had on hand 69,555.64 barrels; and whether appellant could charge appellee with a deficit on the part of Group No. 1 in January and February, 1933, amounting to 71,315.66 barrels, when Group No. 1 had in its tanks on March 1st, 1933, 78,212.43 barrels."

The production and quota of the Texon corporations during the last six months of 1932 and first four months of 1933 was as follows:

| 1932 | Production | Quota for same period at 10,000 bbls. per day. |
|---|---|---|
| July and August | 588,356.79 | 620,000 |
| September and October | 390,145.63 | 610,000 |
| November and December | 420,701.73 | 610,000 |
| 1933 | | |
| January and February | 383,419.51 | 590,000 |
| March and April | 454,390.80 | 610,000 |

The first and fourth articles of the contract are unimportant as they relate to the period between March 1 and December 1, 1925.

By article II the producers agreed to sell "if, as and when produced and removed, all petroleum oil produced and removed from" both the Big Lake lands and Texon lands by the producers after December 1, 1925 "up to, but not exceeding," except as thereafter provided, 20,000 barrels per day.

This article imposes upon the Big Lake Company and the Texon corporations a joint obligation to sell 20,000 barrels per day if such amount was produced and removed from all the lands described in the contract. This obligation we regard as a primary and principal one resting jointly upon all of the producers.

Article III imposed upon the producers the duty to store in their respective storage tanks all oil produced from day to day in excess of the required daily deliveries, so long as the amount so held in storage was less than 300,000 barrels. It then limits the obligation of the Texon corporations in this respect to maintaining in its storage tanks a minimum of 150,000 barrels and like limitation upon the obligation of the Big Lake Company and permits the sale as free oil of all oil in excess of said minimum amounts of 150,000 barrels.

The fifth article provides that if the producers during any two consecutive months

-fail to produce and deliver 20,000 barrels per day to the purchasing company and if, during the two succeeding months the producers have any reserve oil "and/or" produce more than 20,000 barrels per day, then the pro-·ducers are required to make up the deficit in production and delivery in the preceding two months out of such reserve oil "and/or" daily production.

We regard this obligation of the producers to so make up deficits as a joint one; that it was a primary and principal obligation of each producer.

We think the seventeenth article adds strength to the view that the obligation imposed by the second and fifth articles was joint and that the obligation of each producer to supply and make up any deficit in delivery of the other producer was primary and principal.

As shown by the foregoing excerpt from appellee's brief, its contention in effect is that appellant had no right to call upon appellee to make up the Group No. 1 Oil Corporation's deficiency of 45,942.35 barrels for September and October, 1932, because on September 1 and November 1, said corporation had in tanks 74,725.25 barrels and 69,555.64 barrels, respectively, and had no such right respecting the deficiency of 71,315.66 barrels for January and February, 1933, because on March 1 said corporation had in its tanks 78,212.43 barrels.

If this position is sound it is because the obligation to make up the deficits is secondary rather than primary and that article VI fixes such obligation as secondary. Considering said article in connection with the recitals and preceding articles of the contract, we do not think section VI should be so construed. The article makes the obligation to make up deficits conditional upon failure by either group of producers "to deliver an aggregate quantity of petroleum oil, equal to fifty (50%) per cent of the aggregate amount agreed, when produced, to be sold and delivered" and the giving of notice of the deficit and demand as provided.

When the deficiencies arose and the notices and demands were given, the conditional obligation to make up the deficits became absolute and primary upon the part of the Big Lake Company, and it was not a condition precedent to the right of the purchaser to demand performance of such obligation that the purchaser proceed first against Group No. 1 Oil Corporation to enforce delivery of such oil as it might have in its storage tanks.

We recognize that the proper interpretation of the contract in question is not free from doubt, but our view of its proper meaning is as stated. If such view is correct the court erred in sustaining the motion for instructed verdict.

Appellee also presents some propositions which arise out of an alleged counterclaim. Such counterclaim was the basis of the appellee's cross-action which it voluntarily dismissed. When such cross-action was dismissed, only the defendant's general denial remained as defensive and the merits of the counterclaim cannot be considered under such denial.

In the state of the pleadings the ruling upon evidence complained of by appellant was erroneous, but upon the present record such error was harmless and would not of itself call for reversal.

Reversed and remanded.