**REAGAN COUNTY PURCHASING CO., Inc., et al. v. BIG LAKE OIL CO. et al.**

**No. 3465.**

Court of Civil Appeals of Texas. El Paso.

Feb. 25, 1937.

Rehearing Denied May 6, 1937.

G. R. Pate, Burney Braly, and John A. Braly, all of Fort Worth, all for Reagan County Purchasing Co.

Walter H. Walne, of Houston (Baker, Botts, Andrews & Wharton, of Houston, of counsel), for Group No. 1 Oil Corporation.

Robt. T. Neill, of San Angelo, J. C. Adams, of Tulsa, Okl., and Hiner & Pannill, of Fort Worth for Big Lake Oil Co.

NEALON, Chief Justice.

In this case there are three litigants and each of them is an appellant. The original plaintiff was Reagan County Purchasing Company, hereinafter called Purchaser, and the original defendant was the Big Lake Oil Company. The Big Lake Oil Company impleaded Group No. 1 Oil Corporation. These last two litigants will be referred to as Big Lake and Group No. 1 respectively, except when it is more convenient to refer to each or both of them as "Producer" or "Producers."

This is the second appeal of this case as between Purchaser and Big Lake. 81 S.W.(2d) 561. The contract out of alleged breaches of which this controversy springs, is in large part copied in hæc verba in the former opinion, and those portions will not be reproduced here, but only their purport stated when deemed necessary, together with such other provisions as become necessary in discussing the issues and result of the suit.

By the terms of said contract, among other things, the Producers agreed to "sell and did sell" to Purchaser, and it "agreed to buy and did buy" daily from them, from and after December 1, 1925, 20,000 barrels from the production of certain described leaseholds, such purchases to continue during the term of said leasehold estates, each of the producers contracting to furnish 10,000 barrels daily of this amount, provided it could be done out of its daily production and the reserve provided for in the contract, it being further agreed that the oil should be delivered to Purchaser in as nearly equal quantities of 20,000 barrels per day as practicable, said deliveries to be made in equal proportions by Producers, or in as nearly equal proportions as their specified sources of supply permitted.

The reserve was to consist of 150,000 barrels to be built up and maintained, respectively, by each Producer out of the excess produced from said leaseholds above the daily contract requirements. The excess above the required reserve was classified as "free oil," and might be sold to any purchaser available.

The contract created performance periods of two months' length, and delivery of the aggregate contract quantity for each

such period during the specified period constituted performance. Each such period began with an odd-numbered month. in the calendar year and ended with the next succeeding month. In the event of failure of either producer to supply its required quota during one of·these periods, the other producer, upon receipt of written notice within ten days after the close of the bimonthly period in which the deficit occurred, was obligated to supply ·and make up the deficit from any excess oil it had from daily production from said leaseholds and from the contract reserve. It was not required to resort to any other sources of supply than these two.

Purchaser had a resale contract with the Humble Oil & Refining Company for the oil purchased under this contract at an advance of 20 cents per barrel above the price it was to pay Producers. Producers had notice of this contract at all times.

Article X of the contract provides that Producers shall receive for the oil sold to Purchaser "the fair market price of such oil on the date same is delivered by the Producers into the pipe line and gathering system of the Purchasing Company." The fair market price, it was agreed, should be the "average posted price" in the Mid-Continent Field for oil of similar gravity on the date said oil is delivered"—as such price should be posted by not less than two in number of such of the following named companies, as on the respective delivery dates should, at their respective posted prices, be purchasing oil of similar gravity in the Mid-Continent Field: The Prairie Oil and Gas Company, the Texas Company, the Gulf Oil Corporation, the Humble Oil & Refining Company, and the Magnolia Petroleum Company. In ascertaining the "average posted price," the price posted by any subsidiary company "and/or" purchasing agency of said corporations should be considered the price posted by the parent company or the principal, as the case might be. The contract then provides that the average posted price shall mean the price or quotient obtained by dividing the sum of all the posted prices of said companies by the number of said posted notices. The average posted price as computed by Purchaser was to be accepted as correct, unless objected to within fifteen days after receipt of remittance for the delivery in question, in which event, unless the parties could agree, resort might be had to arbitra-

tion, machinery and procedure for which were provided in the contract.

January 10, 1927, Producers joined in a letter to Purchaser proposing certain changes in the terms of article V and VI of the contract. These proposed changes were confirmed and accepted by Purchaser on January 26, 1927, and remained in force until May 11, 1932, five days after Purchaser received from Producers written notice that they elected to terminate the agreement effected by said proposal and acceptance. This method of termination was provided in said letter. This temporary alteration of the original contract was evidenced by the following language in said letter:

"Undersigned Group No. 1 Oil Corporation, Group No. 2 Oil Corporation, Texon Oil and Land Company, and the Big Lake Company, do hereby agree with you that the provisions of aforesaid Article V and VI of said Purchase Contract, relative to the time and manner of delivery of any such deficits in deliveries of oil by either Group of Producers to said Contract, during any two months, by the other Group of Producers during the succeeding two months, shall be suspended until this agreement shall be terminated in the manner hereinafter provided; and during the time of the suspension of said provisions of said agreement, you shall take currently and daily from either the Producer or Group of Producers, current oil production and/or reserve oil, sufficient to make up any deficit in oil deliveries that may occur daily and currently on the part of the other Producer or Group of Producers; and such Producer or Group of Producers shall deliver such deficits of oil due and deliverable by it or them currently and daily.

"This agreement shall not in any manner relieve us as Producers of the obligation to deliver, or you as Purchaser of the obligation to take, the full quantity of oil required to be sold and delivered currently under the terms of said Contract of November 24, 1924. * * *

"It is not intended that the provisions or any of them contained in said Article V and VI of the original Contract dated November 24, 1924, shall in any way be permanently cancelled or modified but only that the provisions thereof relative to the time of delivery of the deficits of oil by the Producer or Group of Producers, required to deliver same, shall be changed as here-

in provided during the continuation of this agreement in order to facilitate a more practical handling of such oil. * * *

"Upon the termination of this agreement, as herein provided, aforesaid Articles V and VI of said original Purchase Contract, dated November 24, 1924, shall again in their entirety, become effective between the parties to said Contract as parts of said Contract, and shall thereafter govern the parties hereto in all respects as if this agreement had never been made."

Purchaser sued Big Lake upon two claims. The first claim was an alleged failure to fully make up deficits upon the part of Group No. 1 amounting to 214,-682.76 barrels occurring in the September-October, 1932, period. The allegation was that after notice given and demand made timely, Big Lake, after being given credit for 1216.75 barrels overdelivered during the September-October period, fell short during the November-December period of making up said deficits by 45,942.35 barrels, to Purchaser's damage in the sum of $9,188.47. The evidence shows the amounts of deliveries and deficits upon the part of Group No. 1, during the September-October, 1932, periods to be as alleged.

The second claim was upon Big Lake's alleged failure to make up a deficit of 71,-315.66 barrels, upon the part of Group No. 1 occurring during the January-February, 1933, period, after timely and due notice. In the evidence there was no question as to the fact that the deficit existed, nor as to its amount, nor as to the further fact that Purchaser received from Big Lake 71,315.66 barrels less than the amount necessary to supply its own quota and make up the deficit upon which the second claim was based. Big Lake, during the months of November and December, 1932, sold the Texas Company 105,371.07 barrels of oil which should have been available for delivery to Purchaser under the contract between Purchaser and Producer. Purchaser, therefore, at the trial sought recovery of Big Lake in the sum of $21,074.21, or 20 cents per barrel upon the amount sold and delivered to Texas Company by Big Lake alleging that the latter company had to the extent of said deliveries to the Texas Company, disenabled itself from performing its contract with Purchaser.

Of the deficit of 46,005.12 barrels made up by Big Lake in September and October, 1932, 18,838.70 barrels accumulated in May and June, 1932. No notice of said deficit was given in July, 1932, but this amount was included in the claimed deficit of 46,005.12 barrels as to which Purchaser gave Big Lake notice on or about September 10, 1932, and in said notice it was represented to Big Lake by Purchaser that the entire deficit of 46,-005.12 barrels accumulated during the July-August, 1932, period. Big Lake now claims that it made up said deficit, relying upon the truth of said representation, and but for such reliance would not have supplied the 18,838.70 barrels that Group 1 was short in the May-June, 1932, period. Of said deficit of 18,838.70 barrels, 4,572.-47 barrels had accrued as of May 11, 1932, the day upon which the temporary alteration of the contract terminated, and the balance accumulated between May 11 and July 1, 1932.

Big Lake filed general demurrer and general denial and pleaded that Continental Oil Company controlled, managed, and directed both Purchaser and Group No. 1, and that the Purchaser and Group No. 1 had by agreement withheld from delivery to Purchaser more than sufficient to make up the alleged deficits; that Group No. 1 had in its tanks deliverable oil in the following amounts, deliverable on the following dates: September 1, 1932, 74,727.-25. barrels; November 1, 1932, 69,555.64 barrels; March 1, 1933, 78,212.43 barrels —and would have delivered said oil to Purchaser at said times but for said alleged agreement. It alleged that after March 1, 1933, Producer received from Group No. 1 the amount on hand on said day; delivery having been withheld in pursuance of said alleged agreement.

By way of cross-action, Big Lake sought to recover from Purchaser 33⅓ cents per barrel upon 46,005.12 barrels of the deficit that it made up in September and October, 1932, alleging that it would have sold said oil at such an advance outside of the contract had it not made said deliveries to Purchaser under the circumstances and for the reasons aforesaid. In the alternative it prayed that the 46,000 barrels be treated as an offset against Purchaser's demand.

By cross-action Big Lake sought judgment in its favor against Group No. 1 of whatever recovery of damages might be had against it by Purchaser.

Group No. 1 answered by general demurrer and general denial.

Purchaser requested an instructed verdict in its favor for $21,082.11, with interest on $9,188.47 from January 1, 1933, and interest on $11,893.64 from May 1, 1933.

Group No. 1 requested an instructed verdict in its favor on Big Lake's cross-action.

There was a trial to a jury, and at the conclusion of the evidence, the court instructed a verdict in favor of plaintiff against Big Lake in the principal sum of $17,324.37, together with interest on $5,420.73 from January 1, 1933, and interest on $11,893.64 from May 1, 1933, and likewise instructed a verdict against Big Lake in favor of plaintiff on the cross-action of Big Lake against plaintiff.

In answer to special interrogatories, the jury found that Group No. 1, at 7 a. m., September 1, 1932, had in its tanks, after deducting basic sediment and water, 53,955.77 barrels of oil it could, in the ordinary course of business, have delivered to Purchaser; that on November 1, 1932, Group No. 1 had in its tanks 48,455.02 barrels, deducting basic sediment and water, which, in the ordinary course of its business, it could have delivered to Purchaser; that on March 1, 1933, at 7 a. m., Group No. 1 had in its tanks and on its leases at Texon, 54,267 barrels of fluid which was free from basic sediment and water, and which in the ordinary course of its business, it could have delivered to Purchaser.

After having overruled Group No. 1's motion for judgment notwithstanding verdict, the court entered judgment in favor of Big Lake against Group No. 1 "up to $10,853.45 of the amount recovered against it (Big Lake) by plaintiff Purchaser." It was ordered that no execution issue against Group No. 1 until Big Lake shall have paid the judgment against it by Purchaser.

In this court the sole basis of complaint by Purchaser is the action of the court in directing the jury to find a verdict in its favor for $3,757.74 less than the amount it claimed upon trial.

Big Lake complains of the action of the court in instructing a verdict against it and in favor of Purchaser, and of the court's refusal to submit six requested issues.

Group No. 1's contentions on appeal are stated in its brief as follows:

"(1) Big Lake Oil Company's cross-petition failed to state a cause of action against Group No. One Oil Corporation.

"(2) That there was no evidence in the record showing breach of contract by Group No. One Oil Corporation for which recovery of damages could be had against it.

"(3) That the court erred in permitting Big Lake Oil Company to get before the jury, in both evidence and argument, prejudicial matter which tended to create bias and prejudice in the minds of the jury against Group No. One Oil Corporation, which material had no proper bearing on any issue in the case."

Further summarization of and quotations from both pleadings and evidence will be made as and when found necessary in ruling upon the issues made on appeal.

## Opinion.

1. As between Purchaser and Big Lake this court held upon the former appeal that the obligation of Big Lake to make up deficits of Group No. 1 after notice and demand was absolute and primary. To that view we now adhere.

2. Logically we must first consider Big Lake's complaint to the effect that the trial court erred in instructing a verdict in favor of Purchaser. The assignments challenging this action of the court are predicated upon the theory that there were conflicts in the evidence as to several vital issues of fact, which the district court in order to instruct the verdict necessarily determined against Big Lake. If these assignments are meritorious, the judgment must be reversed as to all parties, since Big Lake prays merely for judgment over against Group No. 1 for such amount as it may be cast in damages at the suit of Purchaser.

Big Lake contends that there was control by Continental Oil Company of both Purchaser and Group No. 1. This dual control was alleged to result from ownership of a majority of the stock and from actual control, management, and direction of the affairs of both. It urges that executive control of both was lodged in the same persons as officers of both, and that due to this joint control, by agreement and acquiescence, Purchaser had relieved Group No. 1 of its obligation to deliver oil to Purchaser in conformity with its contract obligations, and that by agree-

ment Group No. 1 had withheld from such delivery oil produced by it and deliverable under said contract in order to fix liability upon Big Lake to make up the deficit thereby created; that but for the execution of said wrongful agreement there would have been no apparent deficit; that the deficit by Group No. 1 was a culpable one, and, having been agreed to by Purchaser, Purchaser was barred from recovering of Big Lake on account thereof. It is urged also in Big Lake's brief that as to Purchaser and Group No. 1 there was "a merger or consolidation or corporate relation," such as to make them "parts of the same corporate entity though with separate charters."

There was evidence that about May, 1930, Continental Oil Company "took over the management" of Group No. 1; that in 1932 Continental Oil Company, Group No. 1, and Purchaser had adjacent offices in the Fair Building in Fort Worth; that the only name on the outside door was Continental Oil Company; that the same men were in control of Continental Oil Company and Group No. 1; that Purchaser paid Continental Oil Company a management charge for use of its insurance, purchasing, and engineering departments and for the services of Mr. Skinner, who was pipe line manager for both of said companies; that Purchaser's entire business was that of buying oil from Producers, and reselling as hereinbefore stated; that Purchaser's representative had secured information as to Group No. 1's production from Group No. 1 and from Continental Oil Company's production department. There was no evidence of merger of the three corporations or that Purchaser was under the control of Continental Oil Company, unless it may be inferred from the foregoing and from the reply of Mr. P. L. Arrington, secretary and assistant treasurer of Group No. 1, to a question as to whether said three companies were under the control and direction of the same men, when he said that "in so far as I can see I would say they are more or less under the same management. I can only answer directly for Group No. One Oil Corporation." He did not claim to be familiar with the details of the management of the other two corporations. There was no evidence that Continental Oil Company owned stock in either of the other corporations, nor that their directorates interlocked.

Had the pleading been sufficient to raise the issue of merger, we think the evidence was insufficient to submit it to the jury. The fact that certain services are rendered by Continental Oil Company to Group No. 1 and that "as far as" one of the last-named corporation's employees "could see, they were all managed by the same men," did not prove as a fact that there was a merger or that these corporations should not be treated as separate entities. The case does not come within the rules stated in the authorities cited by Big Lake. In some of the cases cited where the separate identity was ignored, one corporation was a sham created to avoid risk of liability, or the entire stock was owned by the parent company. In others they were shields for natural persons and not organized legitimately to carry on independent business, or the relation of principal and agent existed, or one was merely an adjunct of the other. A short analysis of two Texas cases will serve to illustrate the point of view of our own courts.

Goodwin v. Abilene State Bank (Tex. Civ.App.) 294 S.W. 883, merely held that where one bank took over another bank, carrying the accounts of the first and continuing them into the second, with the same officers and directors, and practically the same stockholders, the only disclosed differences between the corporations being that they had separate charters and different names, there was a question for the jury as to whether the new bank established a second identity. The Goodwin Case rested largely upon the holding of the Supreme Court in Ericson v. Supreme Ruling, Fraternal Mystic Circle, 105 Tex. 170, 146 S.W. 160, in which it was held that when a corporation is consolidated with another or becomes merged therein, whether a new corporation is thereby created or the old corporation is continued will depend much upon the intention of the parties. The facts of the instant case are far removed from those of the cited cases, neither of which sustains Big Lake's position in the instant case.

Illustrative of varying viewpoints as to circumstances that justify courts in holding that different corporations are not in fact separate entities are the majority and minority opinions in Berkey v. Third Avenue Railway Company, 244 N.Y. 84, 155 N.E. 58, 50 A.L.R. 599. The annotations

following the report of this case in the last-named publication likewise illustrate the views of various federal and state courts. Included among them is Oriental Investment Company v. Barclay, 25 Tex. Civ.App. 543, 64 S.W. 80. There is nothing in the record of this case to show that Purchaser dominated Group No. 1. The fact that each purchased technical service from Continental Oil Company does not raise an issue of this character for the jury to decide.

3. Under the original contract, as a condition precedent to fixing one Producer's liability for the deficit of the other, it was necessary for Purchaser to give notice of the deficit within ten days after the termination of the bimonthly period in which the deficit occurred and make demand upon the Producer sought to be held; and except during a period ending May 11, 1932, it was not permissible for the defaulting Producer to supply the deficit within the succeeding bimonthly period unless it could do so out of "free oil." Big Lake claimed that it relied upon Purchaser's representation that the whole deficit shown August 31, 1932, accrued during the July-August period, and by cross-action sought to recover as damages the profit it would have made by selling to Texas Company at an advanced price the amount it supplied to make up Group No. 1's May-June deficit. In its judgment, the trial court denied Purchaser recovery for the failure of Big Lake to make up this deficit of 18,838.70 accrued in May and June, and this action of the trial court Purchaser assigns as error. This claim of Big Lake cannot be sustained. If its theory is correct, its right of action accrued when the alleged fraud was discovered, which, considering the evidence in its most favorable aspect from Big Lake's standpoint, was not later than January, 1933. The cross-action was filed in September, 1935. Purchaser pleaded the two-year statute of limitation. Big Lake's ninth and fifteenth assignments are overruled.

■ 4. It is clear to us that to the extent that Big Lake failed to make up deficits as to which it had received due and timely notice and which it was able to fill out of its reserve and daily production, it was and is liable to Purchaser at the rate of 20 cents per barrel, unless, as it pleaded, such deficit arose because Group No. 1 had on hand deliverable oil which was not delivered to it, and Purchaser consented to such nondelivery, or it was delivered as we hereinafter define delivery, and Purchaser refused to accept it. If Big Lake was unable to so make good Group No. 1's lawful deficits, and its inability arose through its voluntary disenablement by wrongful sales outside of the contract, such partial disability would fail to excuse performance to the extent of such voluntary disenablement. It is equally clear that the sales made to Texas Company during December, 1932, reduced the reserve of Big Lake as of January 1, 1933, to 88,005.21 barrels gross. The evidence indicated that only about 77,991.49 barrels of that was of deliverable quality under the contract. The contract contemplated that the reserve should consist of deliverable oil.

■ 5. The first inquiry then is as to the liability, if any, upon the part of Big Lake as of the month of December 1, 1932; and the first question to be determined is: What part, if any, of the May-June, 1932, deficit was Big Lake obligated to supply? We think that Big Lake was under the duty of making up an amount equal to the deficit that accumulated during the first eleven days of May, 1932, since Purchaser was authorized to apply sufficient of the succeeding period's deliveries to cover this deficit, unless Group No. 1's sales to Big Lake reduced its reserve below 150,000 barrels of deliverable oil as of May 11, 1932, and such sales were consented to by Purchaser with knowledge that they would produce such deficit, if any. This amounted to 4,572.47 barrels. Big Lake was under no obligation to supply the balance of the May-June deficit, and should receive credit upon deliveries thereafter made for the contract price of said balance, unless the jury finds from a preponderance of the evidence that it voluntarily made up said deficit after learning the facts as to when it accumulated. In the latter event, and to the extent that oil was furnished after said knowledge was acquired, it should receive no such credit. As to the amount of the September-October deficit there seems to be no question.

■■ 6. We now pass to the last period around which this controversy rages. Big Lake insists that there is evidence to support the finding of the jury that Group No. 1 had on hand March 1, 1933, deliverable oil in the amount of 54,267.23

barrels. If that be true, and said oil was in Group No. 1's storage or stock tanks in such quantities and condition that it might have been safely taken by Purchaser, and said tanks were put at the disposal of Purchaser, then to that extent Purchaser's recovery against Big Lake should be reduced. We use the words "safely taken" as synonymous with "delivery," because article VII of the original contract provides that Purchaser shall receive the oil from Producers' stock and storage tanks into Purchaser's pipe lines and gathering system "connected with and to the receiving and storage tanks of the Producers by the Purchasing Company." The practice acquiesced in by all parties to the contract, and, considering the nature of oil, probably the only method that was practicable, was for the representative of Purchaser in company with the representative of the Producer immediately involved to test the fluid for basic sediment and water, and determine how much oil it contained above one per cent. of these substances, this being the minimum standard of purity acquiesced in by the parties. Purchaser's agent turned the accepted oil into Purchaser's tanks, and also determined when to shut off the flow into said tanks. The fluid left in the tank is then treated to remove impurities, and after treatment is put back into the tanks for pipe line oil. No oil was accepted until it had settled for at least twenty-four hours, the result being that no oil was accepted from a tank into which oil had been flowed within twenty-four hours. This practice, too, seems to have had the sanction of all concerned. We are now concerned with the state of the tanks of both Producers as of March 1, 1933, at which time the last deficit was complete. Was there in the tanks of either Producer deliverable oil which the Purchaser was in duty bound to take? We think the question of tender does not enter this case except as to oil in receptacles with which the pipelines and gathering system of Producer were not connected or placed in tanks not put at the disposal of Purchaser, for when oil was placed in the stock and storage tanks and settled there for twenty-four hours, and Producers designated the tanks from which oil might be taken, the delivery was as complete as could have been contemplated by the contract. We are concerned only with March 1, 1933, as to this feature of the case, because as Group No. 1 had made no deliveries other than to Purchaser

since May, 1932, and, therefore, amounts shown on hand on the first days of September and November, 1932, and January, 1933, must have been delivered in accordance with contract. At least nothing to the contrary is shown. Group No. 1's tanks contained 78,213.43 barrels of fluid March 1, 1933. The jury found that of this amount 54,267.23 barrels were free from basic sediment and water and could have been delivered by Group No. 1 in the ordinary course of its business. In connection with the special issue that elicited this finding, Big Lake requested the submission of the following special issue: "Was the failure of Group No. One Corporation to deliver such oil as you may find in answer to special issue No. 5 acquiesced and permitted by plaintiff?" If there was any evidence that warranted the submission of special issue No. 5 as to the amount of deliverable oil on hand March 1, 1933, Big Lake was entitled to the submission of its special issue; for the reason that if Group No. 1 tendered Purchaser deliverable oil that it could have taken safely and declined to take, its recovery against Big Lake should be reduced proportionately. No recovery should be permitted against Group No. 1 unless it appears that it intentionally or negligently withheld delivery. In view of the varying estimates of witnesses as to the amount of extraneous matter in the various tanks, and of the further fact that one tank contained 14,261.66 barrels of fluid, and that during the last twenty-four hours Purchaser had run from said tank into the pipe line only 852 barrels without explanation as to why more had not been taken, we cannot say that Group No. 1 delivered and Purchaser received all of the deliverable oil that was in Group No. 1's tanks. A jury might well infer, in the absence of reasonable explanation by Purchaser, upon whom the burden of proof rested, that a substantial quantity of deliverable oil was not taken by it. Big Lake was entitled to have the jury pass upon the question, though the issue as to deliverable oil should be so framed as to permit a finding as to whether the oil was placed by Group No. 1 in its storage and stock tanks from which it was customary for Purchaser to receive it, and the tanks put at the disposal of Purchaser. The issues should be also so framed as to exclude from the computation tanks from which according to practices acquiesced in by the parties Purchaser was not to accept oil; and should also take into account the

accepted practices with respect to the depths to which Purchasers might safely go in drawing off the oil. This line of reasoning also applies to the amount of deliverable oil in Big Lake's storage and stock tanks as of April 30, 1933. These views call for a reversal of the judgment of the court below, and we think they sufficiently indicate our views as to the duties and liabilities of the parties in the situation depicted by the evidence, and as to the issues to be submitted.

7. With respect to the claim of Big Lake that Purchaser failed to receive 9,046.28 barrels of oil on April 30th or May 1, 1933, it is incumbent upon Purchaser to prove that it took all of what is called "pipe line oil" from such of Big Lake's tanks as were designated by the latter's representatives and came within the classes from which by the contract Purchaser was to receive delivery. Nor is pleading or proof of other tender necessary as to oil, if any, left in the tanks from which Purchaser was drawing oil at the time it is claimed this balance was left. If, however, it is claimed that the oil was left in tanks from which Purchaser failed or refused to take oil, plea and proof of tender as hereinbefore defined will be necessary. Big Lake argues that as to various practices heretofore mentioned with reference to the taking of oil, the evidence relates only to Big Lake and does not include Group No. 1. We have, for the purpose of this opinion, treated it as applying to both. The evidence justifies this assumption. These questions, if they are in dispute on another trial, will be for the jury.

8. The general demurrer urged by Group No. 1 to Big Lake's cross-action was properly overruled. Though the pleading is subject to many of the criticisms leveled against it, it does allege Group No. 1's failure to deliver available oil on hand to Purchaser, thereby casting upon Big Lake the burden of making good said deficit or being mulcted in damages. It apprises Group No. 1 of the details of Purchaser's claim by incorporating the petition in the cross-action by reference. The contract on its face discloses that Big Lake will receive only the average, not the highest, price paid by five named Purchasers. It likewise discloses that the oil may be sold by Purchaser for 20 cents more per barrel than Big Lake will receive. It prays for damages. Artistic perfection in pleading, though desirable, is not essential. The cross-action is not a perfect pleading, but "'twill do," as against general demurrer. No recovery can be had against Group No. 1 unless it should be proved that it intentionally or negligently failed to deliver oil to Purchaser, as delivery is herein defined.

9. If it appears that there are questions of fact as to whether Group No. 1's sales to Big Lake in March and April, 1932, caused a reduction of its reserve of deliverable oil as of May 1, 1932, to an amount less than 150,000 barrels, and Big Lake was thereby damaged, and both Big Lake and Purchaser were without notice that said deficit would be thus produced, such issues should be submitted to the jury.

In view of the disposition now being made of the appeal, it will be unnecessary to pass upon the remaining assignments of error. The questions will probably not arise again in the same manner.

The judgment of the district court is reversed, and the cause is remanded.

Reversed and remanded.

## On Motion for Rehearing.

Each party has filed a motion for rehearing. Purchaser and Big Lake agree that their practical construction of the contract is that the storage to be maintained is not necessarily deliverable oil. We, therefore, withdraw our holding to that effect. This makes unnecessary any inquiry as to the state of Group No. 1's storage as of May 1, 1932. The undisputed evidence showed it to be in excess of 150,000 barrels.

We adhere to the view heretofore expressed that Big Lake's alleged right of action against Purchaser is controlled by the two-year statute of limitation. It does not allege breach of a promise contained in the written contract. It alleges a fraudulent representation, which could give rise to an action for deceit. It was therefore an action for debt as defined by the Supreme Court in Gordon v. Rhodes & Daniel, 102 Tex. 300, 116 S.W. 40. Bishop-Babcock-Becker Co. v. Jennings (Tex.Civ. App.) 245 S.W. 104.

We think it immaterial, however, whether or not Big Lake's alleged cause of action was barred by the two-year statute or the four-year statute. The uncontradicted evidence shows that subsequent to October 24, 1932, Big Lake supplied in excess of the May-June

deficit, with the written request that any over delivery be applied to the next succeeding deficit. This does not make a case of relying upon the former representation, nor yet does it constitute as a matter of law a waiver of its right to timely notice of the May-June deficit. Such waiver being a necessary element in Purchaser's right to recover upon the failure to make up this deficit, it must be pleaded and proved by Purchaser.

Upon further examination of the stipulation of January 10, 1927, respecting temporary changes in articles V and VI of the contract we find that we erred in holding that Big Lake in any event was charged with the duty of making up 4,582.27 barrels, the amount of Group No. 1's deficit at the end of May 11, 1932. The stipulation did not suspend the provision requiring notice of deficits. It merely changed the provisions "relative to the time of delivery" of deficits, and expressly provided that no other provisions of the contract should be affected.

We adhere to our holding that Purchaser carried the burden of proving that it accepted all of the pipe line oil proffered by Group No. 1. It was put upon this proof by Big Lake's general denial. It was necessary for Purchaser to prove its case, and part of that case was that it had complied with its obligation to receive all oil that Group No. 1 put in storage and stock tanks and delivered to the custody of its representative, and that there yet remained the deficit which it demanded Big Lake to supply. Paragraph VI of the contract obligated Purchaser to buy from each group the daily production "tendered" it by each Group up to the amount of the contract quoted.

However, when we come to the alleged failure of Purchaser to accept 9,046.28 barrels of oil on April 30, 1933, we hold that the duty was upon Big Lake to both plead and prove that it had on hand pipe line oil which it tendered Purchaser in such condition that it could be taken by Purchaser with safety on or before April 30, 1933, and that Purchaser refused to take it. It would be necessary, not merely that the fluid on hand contain the amount, if any, with which Purchaser is sought to be charged, but that the conditions were such that Purchaser was in duty bound to receive it. We have sufficiently indicated when that duty arose.

In our opinion we expressed the view that Big Lake's pleadings were sufficient as a cross-action against Group No. 1. We did that because they seemed to allege a refusal to deliver oil to Purchaser. Necessarily a refusal would be intentional. The obligations of neither Producer were unconditional. These obligations were conditioned, in the last analysis, upon production. There was no promise to go into the market to make up the daily quota. There was the express obligation as to the operation of the wells stated in article XIV of the contract. Necessarily there was implied an obligation to use reasonable diligence in putting the oil in deliverable condition and tendering it for delivery after production. When these obligations were complied with, Group No. 1's performance was complete. While we thought that Big Lake had not made a case against Group No. 1 on the evidence, yet, inasmuch as its pleadings, with all reasonable intendments resolved in favor of the pleader, seemed sufficient to require submission of the theory of intentional default, we believed it had a right to a remand in order that it might, if possible, further develop its case. However, as we understand its motion for rehearing, Big Lake rejects definitely the theory upon which we based its right to a further hearing upon the asserted cross-action against Group No. 1. In such a situation a new trial as between these two litigants would be futile. Accordingly, a rehearing is granted Group No. 1 Oil Corporation, and the judgment against it and in favor of Big Lake Oil Company is reversed and here rendered in favor of Group No. 1 Oil Corporation.

The motions for rehearing filed by Reagan County Purchasing Company, Inc., and Big Lake Oil Company are overruled.

Costs will be taxed against the two last-named parties in equal proportions.