REAGAN COUNTY PURCHASING CO.,
Inc., v. STATE.

No. 3640.

Court of Civil Appeals of Texas.  El Paso.

Nov. 11, 1937.

Rehearing Denied Dec. 2, 1937.

Burney Braly, G. R. Pate, and John A. Braly, all of Fort Worth, for appellant.

William N. Sands, Asst. Atty. Gen., and Fowler Roberts, Co. Atty., of Big Lake, for the State.

NEALON, Chief Justice.

The State of Texas, in behalf of itself and Reagan county, brought suit against appellant to recover ad valorem taxes alleged to be due on intangible assets or property of the appellant, assessed by the State Tax Board and certified to the tax assessor of Reagan county for the year 1935. The State Tax Board made the assessment pursuant to the provisions of chapter 4, title 122, Revised Civil Statutes of 1925 as amended, Vernon's Ann.Civ.St. art. 7098 et seq., and of chapter 162, Acts of the Forty-Third Legislature (1933), known as House Bill No. 154 (Vernon's Ann.Civ.St. art. 7105 and note), under which "it is made the duty of the State Tax Board to fix and determine the intangible properties, and the value thereof, of each oil pipe line company and all common carrier pipe line companies of every character, whatsoever, engaged in the transportation of oil, doing business wholly or in part within the State of Texas, and to apportion and certify (the assessment and apportionment) to the tax assessor of each county to which any portion of such intangible assets and properties of such corporation is found by said board to be apportionable."

The petition further alleged, and the proof showed, that the defendant rendered for taxation in Reagan county all tangible property, both real and personal, owned by it subject to taxation in that county for the year 1935. A total value of $295,660 was assessed against it on such property, and the appellant paid to the collector the entire amount of taxes due on the assessed value of its tangible properties, real and personal. The appellant refused to pay any part of the state or county taxes claimed on account of the intangible assessment against it. It disputed the entire tax, and made no tender of any part of the sum sued for.

The appellant answered by general demurrer and general denial and by exceptions raising numerous questions as to the constitutionality of the intangible tax statutes. It also raised the same questions of unconstitutionality by special pleas, and alleged that it had furnished some of the information upon which the State Tax Board purported to have based the assessment under duress and threats of prosecution for failure to submit or furnish the information demanded by the State Tax Board. It alleged that the property of other taxpayers in Reagan county was deliberately and systematically undervalued and assessed by the local taxing officials at not more than 45 per cent. of its true value.

The principal defense urged by the appellant was that the intangible tax law does not apply to transporters of oil by pipe line who are not common carrier oil pipe line companies and who are not incorporated oil pipe line companies in the sense that they are in the business of transporting oil for hire; and that appellant does not belong to the class of persons subject to the tax under the express provisions of the law.

It was further contended that the State Tax Board, in arriving at the value assessed, had taken into consideration and based its findings upon earnings of the appellant not in any sense related to, or earned by it in the conduct of, an oil transportation or pipe line business, as a result of which the assessment was grossly excessive, exorbitant, and discriminatory.

A jury was waived, and the case, both on the law and the facts, was tried before the court. The trial judge concluded that the assessment was excessive because the State Tax Board took into consideration profits earned by appellant from the business of buying and selling oil. The court undertook to determine what part of appellant's net earnings was attributable to transpor-

tation of oil and by a method of "capitalization of net income" fixed the taxable value of its intangible assets and property subject to taxation in the county at $769,408, and rendered judgment against appellant for state and county taxes at the rates respectively applicable for the year 1935, on the valuation so found. The defendant was adjudged to pay $9,771.47 with interest from the date of the judgment.

After giving notice of appeal, defendant perfected its appeal to this court.

Among other findings of fact made by the trial court were the following:

"(1) The defendant Reagan County Purchasing Company, Inc., is a foreign corporation doing business in this State, under a permit duly issued. I find from the defendant's charter and a written contract, introduced in evidence, between it and the two groups of producers in the Big Lake oil field in Reagan County, Texas, known as the Big Lake Group and the Texon Group, respectively, that the said purchasing company was organized primarily for the purpose of purchasing the oil produced by the two groups of producers in the Big Lake field, and of transporting such oil from said field. There are no producers of oil in the said Big Lake field except the said two groups who have thus contracted with the purchasing Company. The defendant buys no oil other than that which it buys from the said two groups of producers under the written contract above referred to. It does not offer to buy oil from any other persons or at any other place than in the Big Lake field. It posts no price or prices to be paid for oil, such as are posted by general purchasers of crude oil under the customs obtaining in the industry, the price which it pays to the producers for the oil which it purchases from them, being controlled by specific provisions of said contract, based on prices of certain named general purchasers of crude oil throughout the Mid-Continental oil fields of the United States. The said contract to purchase the oil from the two groups of producers in the Big Lake field was dated and became effective November 24, 1924, and provides that it shall be in effect so long as the producers shall produce oil from said field under the terms of their respective leases, their said leases covering lands belonging to the University Fund of the State of Texas.

"(2) The oil which the defendant purchasing company buys from the two producers in the Big Lake field is resold to the Humble Oil & Refining Company, under the terms of a written resale contract between the defendant and the said Humble Oil & Refining Company, at a gross profit to the purchasing company of 20 cents' per barrel, the said contract providing that the Humble Oil & Refining Company shall pay to the purchasing company a price equal to the price per barrel paid by the latter to the producing companies, plus 20 cents per barrel on each and every barrel of oil delivered to the Humble Oil & Refining Company thereunder. The said contract with the Humble Oil & Refining Company has been in effect since December 15, 1924, but will continue in effect only until April 1, 1940. The purchasing company has no contractual arrangement, nor is any contemplated at this time, between it and any other purchaser of oil for the disposition of the oil it buys in the said Big Lake oil field, after April 1, 1940.

"(3) The defendant has and owns a pipe line system located in its entirety in Reagan County, Texas, consisting of gathering lines in the said Big Lake oil field, and a stem or trunk line extending from the said field to the defendant's Kemper Tank Farm situated some eight miles east of the field. It receives the oil purchased by it from the two groups of producers at the tanks of the producers in the Big Lake field. It then transports the oil from the field through its pipe line to its said tank farm where it is stored in tanks until delivered to the Humble Oil & Refining Company under the terms of the resale contract aforesaid. The purchasing company buys the oil and measures it as it is run from the tanks of the producers, so that all oil run into and through its lines belongs to the purchasing company. The Humble Oil & Refining Company then receives the oil from the storage tanks of the purchasing company located at the latter's Kemper Tank Farm, and as the oil leaves the tanks of the purchasing company it becomes the property of the Humble Oil & Refining Company.

"(4) Although authorized by its charter and permit to engage in the business of transporting oil by pipe line, the defendant has never engaged in the business of transporting oil for others for hire or otherwise. As aforestated, all the oil which it transports through its pipe line system belongs to it. The defendant has

never exercised the right of eminent domain. It has never published, or filed with any regulatory body, tariffs or rates for transportation of oil. It has never offered its services to the public generally or held itself out as a carrier for hire, or in any manner devoted its facilities to the public use."

As to the assessing of value by the State Tax Board, the court found: " * * Said value was assessed and fixed by the State Tax Board by a process of 'capitalizing' what it understood and believed to be the entire net revenue of the defendant for the year 1934, taking into consideration earnings of said defendant from all of its activities, that is to say, earnings from the purchase and sale of oil, as well as earnings that might be properly attributed to the transportation of oil; the computations of said Board being based upon a gross earning of 20 cents per barrel from each and every barrel of oil bought, transported and sold by the said purchasing company during the calendar year 1934."

The trial court reduced the assessment of the State Tax Board; the court's method being shown by its seventh finding of fact, which reads as follows:

"(7) I find that only one-fourth (¼) of the gross earnings of the defendant on oil bought, transported and sold by it during the year 1934, is properly attributable to and should be allocated to gross earnings as from pipe line transportation instead of the entire 20 cents per barrel used by the said Tax Board. While, as found above, no transportation or tariff charges are made or published by the defendant, I find as a fact that 5 cents per barrel would be and constitute a fair and reasonable charge for the transportation of such oil if it had been transported for others for hire, and that 5 cents was the transportation rate determined and used by the defendant as the basis for computation of the Federal Excise Tax on the transportation of oil by pipe line under Federal statutes existing at the time said intangible assessment was made. On the basis of a gross earning of 5 cents per barrel for all oil transported during the year 1934, and applying thereto the formula adopted and used by the State Tax Board for determining the intangible value of the defendant for the taxable year 1935, I find that 60 per cent of the intangible value of the defendant, attributa-

ble to its pipe line system and operations as of the year 1935, is $769,408.00. The said value is arrived at in the following manner and by the use of the following factors and calculations, all of which I find to be true and correct, to-wit:

| | | |
|---|---|---|
| Value of tangible and intangible property determined by the capitalization of net income at 10% | | $1,454,780.00 |
| The assessment of the property on a basis of 60% of its true value is | | 872,868.00 |
| Deduct the amount of the value assessed by the County Tax Assessor-Collector | | 103,460.00 |
| Remainder, which is the assessment on the intangible value, | | 769,408.00 |
| Revenue—4,621,292 barrels at 5¢ | | 231,065.00 |
| Pipe line Operating Expenses | | |
| Maintenance | $ 2,958.00 | |
| Transportation | 23,754.00 | |
| General | 9,784.00 | $36,496.00 |
| Taxes | | |
| Ad valorem | 2,767.00 | |
| Fed. Transportation | 9,242.00 | |
| Federal Income | 25,672.00 | 37,681.00 |
| Depreciation | | 11,410.00 85,587.00 |
| Net Profit | | $ 145,478.00 |

"Operating expenses obtained from financial statement prepared by Reagan County Purchasing Company.

"Ad valorem taxes obtained from the same source.

"Federal transportation tax was computed by taking 4 per cent of pipe line revenue.

"Federal income tax was determined as being equal to 15 per cent of the net profit before Federal income tax.

"Depreciation expense was estimated as one-eleventh of the value of the physical property. The value of the physical property used in this calculation was the value per testimony of Mr. Ehrenborg."

The court further found that the taxing officials of Reagan county systematically valued all taxable property in the county on a basis of 60 per cent. of its taxable value; hence the assessment of appellant's property on the basis of 60 per cent. of its true value.

### Opinion.

Appellant, by its first assignment of error, challenged the conclusion of the trial court "that the defendant, although not a common carrier in fact, is nevertheless an oil pipe line company and is subject to the intangible tax law by rea-

son of the amendment of article 7105 by section 12, Chapter 162 (House Bill No. 154), Acts of the Forty-third Legislature, Regular Session [Vernon's Ann.Civ.St. Art. 7105 and note]. Appellant is a pipe line company. It operates a pipe line transporting oil from the wells of two groups of producers in the Big Lake oil fields in Reagan county, to· wit, the Big Lake group and the Texon Group, to Kemper, under a contract by which practically all of the oil produced in the field is sold to appellant, and by it resold under pre-existing contract to the Humble Oil & Refining Company, at a price equal to the price paid by the former to the producing company plus 20 cents per barrel on each and every barrel of oil delivered to the Humble Oil & Refining Company under said contract. It purchases from none except the two named producing companies, and sells to no other purchaser than the Humble Oil & Refining Company. The contracts under which it purchases have been analyzed and in large part reproduced in former opinions ·of this court in the case of Reagan County Purchasing Company v. Big Lake Oil Company, 105 S.W.2d 462 and 81 S.W. 2d 561. The necessity which made it imperative for these producers to enter into said contract with appellant or into some other similar contract is thus stated in the preamble to the contract:

"Whereas, the producers have developed an oil field on said leasehold estates to the extent that they are producing an aggregate daily production of approximately five thousand (5,000) barrels of high gravity petroleum oil, and

"Whereas, the producers desire to further develop and operate their said leasehold estates in order to produce, remove from and market the petroleum oil produced from said Big Lake lands and Texon lands, but are unable to do so because the producers now have at or near said leasehold estates no sufficient market upon which to market and sell the petroleum oil which is now being produced by them, or that may hereafter be produced by them from their said leasehold estates; and

"Whereas, said leasehold estates are located some two hundred miles distant from any oil trunk pipe line available for the transportation of the oil produced by the producers to market and are located in proximity to only one railroad which is inadequate for economically transporting the oil produced from said leasehold estates to market, and the producers have no market for but a small part of said oil and it is impracticable for them to build storage·tanks and store the oil being produced, and desired to be produced by them, and it is necessary that the producers, in order that they may properly develop and operate their said leasehold estates, obtain a dependable market for all or a large part of the oil produced by them from their leasehold estates; and

"Whereas, although the Purchasing Company now has no receiving or storage tanks at or near the Producers' said leasehold estates and has no system of gathering pipe lines to gather and transport said oil to receiving and storage tanks, the Purchasing Company, in order to procure an exclusive sale to it of all oil produced by the Producers from said leasehold estates not exceeding the amounts hereinafter stipulated, is willing to construct, at some point or points in the vicinity of said leasehold estates to be determined by the Purchasing Company, receiving and storage tanks, pipe line or lines, pump stations, other equipment and facilities necessary for gathering and transporting the oil produced by the Producers from their said leasehold estates to the receiving and storage tanks of the Purchasing Company so constructed, if the Producers will sell to the Purchasing Company all of the petroleum oil produced and removed by them from said Big Lake lands and Texon lands, during the present terms of said leasehold estates and of all extensions and/or renewals thereof up to but not exceeding the amounts hereinafter stipulated. * *"

Appellant is not a corporation of the character included within the terms of article 1503, R.C.S. It is a Delaware corporation which has been granted a permit to do business in Texas, which permit authorizes it to:

"(a) store, transport, buy and sell oil and gas and other. mineral solutions and to make reasonable charges therefor.

"(b) lay down, construct, maintain and operate pipe lines, tubes, tanks, pump stations, connections, fixtures, storage houses and such other machinery, apparatus, devices and arrangements as may be necessary to operate such pipes and pipe lines between points in this State."

The authorized powers are among those permitted by article 1496, R.C.S. A close study of the contracts reveals that the real function of appellant was to furnish pipe line and storage service which the producers were unable to furnish. Appellant contends, however, that in any event the Legislature did not intend to tax a corporation transacting the business in which it was engaged, resting said proposition upon the following provision included in the amendment of art. 7105, R.C.S. as amended by section 12, chapter 162, Acts of the Forty-third Legislature regular session (Vernon's Ann.Civ.St. art. 7105 and note): "The purpose hereof is to place all common carrier oil pipe line companies under all of the provisions of the Intangible Asset Tax Laws of this State."

This purpose clause, however, in addition to the quoted language, contains the following: "And, for the purpose of placing under said act all taxpayers similarly situated, and to bring about a better classification and a wider distribution of the burdens of taxation, as far as this class of taxpayers is concerned."

The text of the amendment provides that: "Each incorporated * * * oil pipe line company, and all common carrier pipe line companies of every character whatsoever, engaged in the transportation of oil, * * * in addition to the ad valorem taxes on tangible properties which are or may be imposed upon them respectively, by law, shall pay an annual tax to the State, * * * on their intangible assets and property, and local taxes thereon to the counties in which its business is carried on." It will be observed that both "pipe line companies" and common carrier pipe line companies are enumerated among those who are to pay the tax upon intangible assets. The language is plain, and if we are to give to it its plain meaning, we must hold that appellant comes within the enumerated classes. We are reinforced in this belief by the fact that the caption, in stating the purposes of the act, likewise uses the same terms in the same sequence. Had the Legislature intended to limit the application of the act to pipe line companies transacting the business of common carriers of oil, it could very readily have done so. The meaning is clearly expressed. "A thing expressed puts an end to implication."

■ However, the record justifies the court's finding that appellant is a common carrier. It comes squarely within the definition of "common carrier" formulated by the Legislature in article 6018 of R.C.S.1925, which, in subdivision 4 thereof, provides that: "Every * * * corporation * * * owning, operating or managing * * * under lease, contract or purchase, agreement to buy or sell, or other agreement or arrangement of any kind whatsoever, any pipe line or pipe lines, or part of any pipe line, for the transportation from any oil field or place of production within this State to any distributing, refining or marketing center or reshipping point thereof, within this State, of crude petroleum bought of others; is hereby declared to be a common carrier and subject to the provisions of this law."

As heretofore stated, its charter, granted subsequent to the enactment of said provision, permits the transaction of the business of a common carrier, as does its permit to do business. The profit of 20 cents per barrel stipulated in its contract with the Humble Oil & Refining Company has all the characteristics of a charge for service. It is not dependent upon the state of the market. It is fixed; and market fluctuations cannot affect it. The hazards of the market have no place in appellant's scheme of things. Its return is as definite as the compensation of employees in the office and the field. Why should the Humble Oil & Refining Company pay this definite charge in excess of the market price unless it be for transportation of the oil from the producer to the purchaser, together with incidental storage service?

In re Champlin Refining Co., 129 Okl. 166, 264 P. 160; United States v. Ohio Oil Co. (Pipe Line Cases), 234 U.S. 548, 34 S. Ct. 956, 58 L.Ed. 1459; Motter, Collector, v. Derby Oil Co. (C.C.A.) 16 F.2d 717; Derby Oil Co. v. Motter, 273 U.S. 762, 47 S.Ct. 477, 71 L.Ed. 879.

■ Appellant also contends that the court was without power to find and decree a valuation and render judgment in conformity to its findings. With this contention we cannot agree. The effect of the court's action was to find that the board's action was erroneous in a certain amount and to reduce the State's recovery to the extent of the excess. Since, as we think, the board had jurisdiction to assess the value of appellant's assets, its action was

not determined to be void, but merely erroneous. If it be conceded that the court was correct in this latter holding, it pursued the proper course in adjudging what the correct assessment was and what amount was due thereunder. Illinois Central. R. R. Co. v. Bosworth (D.C.) 209 F. 465; Illinois Central R. R. Co. v. Greene, 244 U.S. 555, 37 S.Ct. 697, 61 L.Ed. 1309; Lively v. Missouri, etc., R. Co., 102 Tex. 545, 120 S.W. 852.

Some question indeed there may be as to the right of appellant to question the amount of the assessment, provided the board has jurisdiction to act. This attack is collateral, and the following language of the Commission of Appeals in Druesdow v. Baker, 229 S.W. 493, at page 495, seems apt: "The decisions of the Tax Board in the matter of valuations are quasi judicial in their nature. This action is therefore a collateral attack upon the judgment of a quasi judicial tribunal. Such an attack cannot be justified in the absence of fraud, or something equivalent thereto; lack of jurisdiction; an obvious violation of the law, or the adoption of a fundamentally wrong principle or method, the application of which substantially injures complainant. No mere difference of opinion, as to the reasonableness of its valuation, when such valuations, though deemed erroneous, are the result of honest judgment, will warrant interference by the courts. Pittsburg, C., C. & St. L. R. Co. v. Backus, 154 U.S. [421] 434, 14 S.Ct. 1114, 38 L.Ed. [1031] 1039; Western Union Telegraph Co. v. Taggart, 163 U.S. [1] 30, 16 S.Ct. 1054, 41 L.Ed. 49."

However, since the court, by entertaining appellant's defense, reduced its burden, and the State urges no counterassignment, it is unnecessary to determine this question.

■ Appellant assigns as error the court's finding of fact that "the defendant is possessed of and owns considerable intangible assets and property subject to taxation in Reagan County," insisting that there is no evidence to support such finding. The evidence was ample. Intangible values ordinarily result from the profits of a business as actually conducted. They inhere to it as a "going concern," in many cases far exceeding the tangible values to which they adhere. State v. Austin & Northwest R. R. Co., 94 Tex. 530, 62 S.W. 1050. There was evidence that appellant had during 1934 a gross earning for oil transportation of more than $230,000, with a transportation cost of less than $67,000; that during 1935 its

gross transportation income was $181,831.06, with transportation cost of $53,964.44, while the value of all tangible property devoted to transportation was not in excess of $126,-000. The conclusion to be arrived at from these figures is too plain to require comment. The assignment is overruled.

■ Most of the other complaints of appellant have been before the courts and decided contrary to appellant's contentions. The act is not unconstitutional because it allows the board to calculate intangible values by other methods than the one suggested by the statute, provided said other methods produce the correct result. Indeed this feature of the act was commended by our Supreme Court in Missouri, K. & T. Ry. Co. v. Shannon, 100 Tex. 379, at page 395, 100 S.W. 138, 142, 10 L.R.A.(N.S.) 681. The same decision holds in principle adversely to appellant's view that the statute makes no provision for the equalization of intangible values. That the statute does not violate the Fourteenth Amendment of the Constitution of the United States was held by the Supreme Court of the United States in Baker v. Druesedow, 263 U.S. 137, 44 S. Ct. 40, 68 L.Ed. 212. In the instant case, appellant's intangible values have been equalized upon the basis applied to taxes upon tangible property in Reagan county.

■ There is no merit in appellant's objection to the process of calculating intangible values by a process of capitalizing net earnings. This process has received the approval of the courts as reasonably calculated to secure correct results. Illinois Central R. R. Co. v. Greene, supra; Louisville & N. R. Co. v. Greene, 244 U.S. 522, 37 S.Ct. 683, 61 L.Ed. 1291, Ann.Cas.1917E, 97.

The court's findings as to amounts were based upon and justified by expert testimony.

■ Finally, appellant insists that, as applied to its property, which is located wholly within Reagan county, the intangible tax law and the administration thereof are in conflict with sections 11, 14, and 18 of article 8 of the State Constitution. So far as pertinent here, these sections read as follows:

"Sec. 11. All property, whether owned by persons or corporations shall be assessed for taxation, and the taxes paid in the county where situated."

"Sec. 14. There shall be elected by the qualified electors of each county at the same time and under the same law regulating the

election of State and county officers, an Assessor of Taxes, who shall hold his office for two years and until his successor is elected and qualified."

"Sec. 18. The Legislature shall provide for equalizing, as near as may be, the valuation of all property subject to or rendered for taxation, (the County Commissioner's Court to constitute a board of equalization); and may also provide for the classification of all lands with reference to their value in the several counties."

These sections must be construed in connection with section 17 of article 8, which reads as follows: "Sec. 17. The specification of the objects and subjects of taxation shall not deprive the Legislature of the power to require other subjects or objects to be taxed in such manner as may be, consistent with the principles of taxation fixed in this Constitution."

In interpreting these provisions it must be borne in mind that at the time the Constitution was formulated and ratified, Texas had not adopted the policy of taxing intangible assets. Tangible property occupied the attention of taxing officers and commissioners' courts. In greatest part it was real estate, livestock, and other visible personalty of the values of which officials possessed first-hand knowledge. It seems reasonable to believe under the circumstances that the framers of the Constitution had in mind the fact that not all property would be of such character, and thus, in section 17, left the Legislature free to handle the matter in the manner that seemed wisest and best calculated to secure that uniformity and equality demanded by section 1 of article 8. These ends could only be realized by placing the duty of fixing the valuation of intangibles upon those who have readiest access to the corporate reports and other sources of information. Hence, the manner in which the State Tax Board is constituted. To so hold, we think, would be in harmony with general views expressed by Chief Justice Gaines in the opinion published in Missouri, K. & T. Ry. Co. v. Shannon, supra, which, after saying that it is probable that the matter of the situs of the intangible assets of a railroad was not in the minds of the makers of our Constitution when they framed article 8, continued:

"But that they apprehended that some question of a like character might arise under the restrictions upon taxation embodied in article 8 of the Constitution is shown as we think in a subsequent section of that article, which is as follows: 'Sec. 17. The specification of the objects and subjects of taxation shall not deprive the Legislature of the power to require other subjects or objects to be taxed, in such manner as may be consistent with the principles of taxation fixed in this Constitution.' It follows * * * the section just quoted affords ample authority to the Legislature to tax such intangible assets as a subject or object of taxation omitted from those specified in the previous sections of the article.

"It is argued that section 14, properly construed, means, not only that there shall be an assessor of taxes elected for each county, but that he and no other officer shall be intrusted with any part of the duty of making the assessment. We think the claim is too broad. The section contains no language which expressly prohibits the appointment of a board to assess taxes in a particular case. Unlike other provisions of the Constitution which create offices, it does not define the duties of the officer, from which we think it is to be inferred that the scope of his duties was left to the determination of the Legislature. While we think that the Legislature could not strip the assessor of all authority, and probably that it was intended by the framers of the Constitution that all ordinary assessments of property for taxation should be made by him, still we think it was not intended to deprive the Legislature of the power of devolving the duty upon another officer, or board to assess property in some special case, where, as in the present instance, the county assessors were clearly unable from the means at their disposal to ascertain with any reasonable degree of approximation the value of the intangible assets of the railroad company, and still less capable of making intelligently the apportionment due to their respective counties."

We think the act is valid as applied to a taxpayer in appellant's position, and so hold.

Appellant's assignments of error are overruled.

The judgment of the district court is affirmed.